**NEWMARKET MANUFACTURING COMPANY, Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

No. 5004.

United States Court of Appeals First Circuit.

Heard Jan. 3, 1956.

Decided May 18, 1956.

Randolph E. Paul, Washington, D. C., with whom Louis Eisenstein, Washington, D. C., was on the brief, for appellant.

Joseph F. Goetten, Atty., Department of Justice, Washington, D. C., with whom H. Brian Holland, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Department of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and Arthur I. Weinberg, Asst. U. S. Atty., Boston, Mass., were on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Newmarket Manufacturing Company, a Delaware corporation, brought suit against the United States in the United States District Court for the District of Massachusetts, seeking to recover an alleged overpayment of income taxes for the fiscal year ending November 30, 1951. Determination of the issue presented involves an interpretation and application of the so-called "carry-back" provision of § 122 of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A., whereunder a taxpayer is permitted in some circumstances to carry back a net operating loss of one fiscal year as a deduction against income earned in the preceding year. The district court, after trial without a jury, entered judgment dismissing the complaint. 130 F.Supp. 706. It seems to us that the district court committed error of law in this respect, and that plaintiff's appeal should succeed.

In 1944 Newmarket Mfg. Co., having been organized as a Massachusetts corporation, established a usual place of business in Lowell, Mass., and engaged in the business of weaving synthetic fibers.

On September 26, 1951, Newmarket Mfg. Co., the Massachusetts corporation, caused the organization under the laws of Delaware of a subsidiary of the same name. This Delaware corporation had an authorized capital stock of 450,000 shares with a par value of $2.50 each, and it issued 400 shares of its capital stock to the Massachusetts corporation for $1,000 cash. These 400 shares, which at that time were the only shares of the Delaware corporation outstanding, were later canceled on the date of the merger about to be described.

According to the Agreed Statement of Facts in this case,

"The sole purpose of Newmarket Massachusetts in causing the organization of Newmarket Delaware was to merge Newmarket Massachusetts with Newmarket Delaware, its wholly-owned subsidiary, in order to remove the taxpayer's corporate domi-

cile from Massachusetts to Delaware and thereby avoid an application of the Massachusetts Corporate Franchise Tax with respect to sales made in New York State, which the Company and its counsel considered to be incorrect and unjustified under the Massachusetts statute providing for such tax."

This objective to be achieved by changing the corporate domicile of Newmarket Mfg. Co. was perfectly legitimate—the district court correctly described it as a "bona fide" corporate purpose; and of course it was not in any sense a maneuver to avoid or evade federal taxes.

During the brief period from the date of its organization on September 26, 1951, until the effective date of the merger, November 30, 1951, the subsidiary Delaware corporation carried on no business, had no liabilities, and its sole asset was the $1,000 cash paid in by the Massachusetts corporation as above stated. The tax return of the Delaware corporation for that brief period showed no income and no tax due.

At the close of business on November 30, 1951, the Massachusetts corporation merged with its wholly-owned Delaware subsidiary, in a statutory merger pursuant to the corporation laws of the two states. All the assets of the surviving Delaware corporation came from the Massachusetts corporation; the Agreement of Merger provided that, without other transfer, the surviving Delaware corporation should succeed to all the rights, assets, franchises, etc., of the two constituent corporations, that is, of the Massachusetts corporation and of its wholly-owned Delaware subsidiary; and it also stated that "all debts, liabilities and duties of the respective Constituent Corporations shall thenceforth attach to the Surviving Corporation and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." The latter provision is said to be, and probably is, a prerequisite to an effective statutory merger under the corporation laws of both states. To avoid the nuisance and expense involved in the surrender of the certificates of stock of the Massachusetts corporation and the issuance in substitution therefor of new certificates of the surviving corporation, the Agreement of Merger provided that each outstanding certificate of stock of the Massachusetts corporation "shall be deemed for all corporate purposes, including the payment of dividends," to evidence the ownership of corresponding shares of the capital stock of the surviving Delaware corporation. Finally, the Agreement of Merger provided that the organization of the Massachusetts corporation, "except in so far as it may be continued by statute, shall cease as soon as" such merger should become effective, "and thereupon Newmarket Delaware and Newmarket Mass. shall become a single corporation, to wit, Newmarket Delaware, one of the parties hereto." As stated by the district court: "After the merger, the Massachusetts corporation ceased to exist as a separate corporation."

On and after the effective date of the merger, the surviving Delaware corporation had the following characteristics identical with those of the predecessor Massachusetts corporation: The par value of the shares of stock of the surviving corporation was the same as the par value of the shares of stock of the Massachusetts corporation; the number of shares of stock outstanding in the surviving corporation, and the ownership thereof, were exactly the same as the number and ownership of the shares of stock of the Massachusetts corporation; the officers of the surviving Delaware corporation were the same as those of the extinguished Massachusetts corporation; and the new corporation conducted the same business (and no other) in the same places and in the same manner as had the Massachusetts corporation immediately prior to the merger. The corporate purposes stated in the charter of the surviving Delaware corporation were substantially equivalent to the corporate purposes which had been stated in the charter of the Massachusetts corporation.

The operations of the Massachusetts corporation for the full fiscal year ending with the date of the merger, November 30, 1951, resulted in a federal income tax liability of over $400,000, according to the tax return for this period, which was filed by the surviving Delaware corporation. The latter, during the year 1952, paid the income tax shown to be due thereon.

Subsequent to the merger, during the first full fiscal year of the surviving Delaware corporation, ending November 30, 1952, that corporation, in conducting the business of weaving synthetic fibers previously engaged in by the Massachusetts corporation, suffered a net operating loss of $660,370.97 which was available for possible carry-back or carry-over. Operations for several subsequent years also resulted in net losses. On March 6, 1953, this Delaware corporation filed with the Director of Internal Revenue at Boston, Mass., a claim for refund of income taxes theretofore paid by it for the fiscal year ending November 30, 1951, on the return filed by it on behalf of the former Massachusetts corporation. The statement of claim recited that, "For the loss period, the taxpayer was a Delaware corporation; for the period for which refund is claimed, the taxpayer was a Massachusetts corporation." Further, it stated: "the loss sustained by the taxpayer in the fiscal year ending November 30, 1952, gives rise to a net operating loss carryback deduction for the Massachusetts corporation for its fiscal year ending on November 30, 1951, the date of the merger." The Commissioner having failed to act on the claim for refund for a period of more than six months from the date of its filing, the surviving Delaware corporation on September 8, 1953, filed its complaint in the court below for recovery of such refund.

We refer now to the applicable statutory provisions in the 1939 Code, as amended. They furnish no explicit guidance for the problem at hand. Section 23(s) authorizes the deduction from gross income of "the net operating loss deduction computed under section 122."

The cross-reference is to a long, complicated section, the effect of which may be summarized in three parts: *First*, § 122(a) and (d) define "net operating loss" as, roughly, an excess of business deductions over gross income in a given taxable year. *Second*, for the years relevant here, § 122(b) (1) (B) provides: "If for any taxable year beginning after December 31, 1949, *the taxpayer* has a net operating loss, such net operating loss shall be a net operating loss carry-back for the preceding taxable year." [Italics added.] Similarly, such net operating loss may be a carry-over for each of the five taxable years following the loss year, subject to certain adjustments. § 122(b) (2) (B). *Third*, the "net operating loss deduction" for a given year is, roughly, the sum of the carry-backs and the carry-overs to that year. § 122(c). In the present case we are concerned with only two taxable years and with a single carry-back; according to appellant's contention, the net operating loss which it suffered in the fiscal year ending November 30, 1952, may be carried back and applied as a deduction against the income earned by the Massachusetts corporation in the fiscal year ending November 30, 1951.

The government's answer is simple: The carry-back is available only where it is the same "taxpayer" who has had the good year succeeded by a bad one; but here Newmarket Mfg. Co. incorporated under the laws of Massachusetts is necessarily a different legal entity from Newmarket Mfg. Co. incorporated under the laws of Delaware, and so the two are not the same "taxpayer" within the meaning of § 122(b) (1) (B).

An issue of this sort peculiarly lends itself to logic-chopping, fine-spun distinctions, and dubious arguments by analogy. In the present opinion we shall try to keep this sort of thing to a minimum.

What may be supposed to have been the concern of the Congress, in sanctioning these departures from the general system of a strict annual accounting?

There was a desire to bring stability to the tax burden of "a business with alternating profit and loss." H.R.Rep.No. 855, 76th Cong., 1st Sess. 9–10(1939). Whose burden? That of an artificial legal entity called a corporation, or that of the human beings doing business behind the corporate facade and who, alone, actually feel the pinch of taxation? When, as here, everything in the business remains the same, except for the change of corporate domicile from Massachusetts to Delaware, the answer as an *a priori* matter seems easy: Income-taxwise, there is no more reason why the Congress should choose to attach crucial significance to a mere change of corporate domicile than it would to a change of an individual taxpayer's domicile from Massachusetts to Delaware.

It is important also to observe in the present case that throughout the whole period in question there was only one single business—the business of manufacture and sale of woven synthetic fibers—which had a profitable year followed by several bad ones. The statutory merger does not have the result here of allowing Newmarket Mfg. Co. to obtain a carry-back privilege and a refund that would otherwise have been unavailable, which may be the effect of a merger of several businesses, as in Libson Shops, Inc., v. Koehler, 8 Cir., 1956, 229 F.2d 220, a case in which the carry-back was denied. On the contrary, but for the statutory merger the Massachusetts corporation would have been entitled to the carry-back deduction, resulting in a tax refund to it for the fiscal year ending November 30, 1951. Thus the government has to sustain the contention that the effectuation of this statutory merger, changing the corporate domicile of Newmarket Mfg. Co., defeats the carry-back deduction which would otherwise have been available. Cf. United States v. Snider, 1 Cir., 1955, 224 F.2d 165, 168.

When the Congress came to enact the Internal Revenue Code of 1954, it extensively revised the provisions of law giving carry-over and carry-back privileges. Section 172 of the 1954 Code, 68A Stat. 63, is the equivalent of § 122 of the 1939 Code except that the Congress—apparently deliberately—omitted the words "the taxpayer," which pointed up the difficulty in the present case under the 1939 Code. With respect to the situation of a change in corporate entity, § 381 of the 1954 Code authorizes the carry-over in certain tax-free corporate reorganizations (including, but not limited to, statutory mergers), not only of net operating losses but also of many other items (such as earnings and profits, capital losses, bond discount amortization, pension plan contributions, etc.). Section 382 bars, or limits in amount, the carry-over of a net operating loss where new owners come into the business pursuant to a reorganization. The details are not now relevant, but for present purposes it may be said in summary that, in accordance with the provisions of §§ 381 and 382, in a tax-free reorganization the net operating loss of each component may be carried over to the survivor, subject to certain limitations, but without the necessity of showing any legal identity between the predecessor and the successor. As to the carry-back privilege, one of the "operating rules" of § 381(b) is that, except in the case of "an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a) (1)," the surviving corporation shall not be entitled to carry back a post-reorganization net operating loss to a pre-reorganization tax year of a nonsurviving component. The cross-reference in the exception is to the statutory definition of that type of reorganization which is "a mere change in identity, form, or place of organization, however effected"—which was the type of reorganization that occurred in the case at bar. See Mertens, Law of Federal Income Taxation, Code Commentary § 381(b):2 (1955). Thus it is clear that if the provisions of the 1954 Code were applicable to the present case, appellant Newmarket Mfg. Co. would be entitled to the claimed refund.

We recognize that the 1954 Code should not be treated as a legislative declaration of the meaning to be ascribed to § 122(b) (1) (B) of the 1939 Code. This is so particularly because the House committee took note of the fact that "present practice rests on court-made law which is uncertain and frequently contradictory," H.R.Rep.No.1337, 83d Cong., 2d Sess. 41 (1954), and because the committees of both the House and Senate threw out the caution: "No inference is to be drawn from the enactment of this section whether any item or tax attribute may be utilized by a successor or a predecessor corporation under existing law." H.R. Rep.No.1337, supra at A135 (1954); S. Rep.No.1622, 83d Cong., 2d Sess. 277 (1954). We only refer to the 1954 enactment to point out that, when the Congress focused sharply on the problem now involved, it decided that a carry-back privilege was not to be lost in consequence of a reorganization that was no more than "a mere change in identity, form, or place of organization, however effected." This indeed is not surprising, when it is considered that taxation is an intensely practical matter, which ought to turn upon economic realities rather than upon technical differences of the corporate entity consequent upon the migration of a corporation from one state to another. We think the government's argument puts altogether too much weight upon the words "the taxpayer" in § 122(b) (1) (B) of the 1939 Code, as amended. These words, we think, could not have been intended by the Congress to be words of art requiring the thin distinction between Newmarket Mfg. Co. before and after its incorporation in Delaware.

The only Supreme Court cases to which we need refer are New Colonial Ice Co., Inc., v. Helvering, 1934, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348, and Helvering v. Metropolitan Edison Co., 1939, 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957. Neither case is precisely in point here, though the assumptions and line of reasoning of the Supreme Court in the Metropolitan Edison case seem to lean in the direction of the appellant's position in the case at bar.

In New Colonial Ice Co., Inc., v. Helvering, supra, the Court was concerned with the net loss carry-over provision of § 204(b) of the Revenue Act of 1921, 42 Stat. 231. The assets and business of a corporation in some financial difficulty were taken over by a new corporation in exchange for the latter's stock, which the old corporation proceeded to distribute, share for share, to its own stockholders in order to retire the old stock. The old corporation, however, remained technically in existence, the reorganization having been accomplished not as a statutory merger but solely on a contractual basis. It was held that the new corporation was not entitled under § 204 (b) to deduct a pre-reorganization net loss of the old corporation from post-reorganization income of the new corporation. We pass by certain suggestions for distinguishing the case from that of a similar reorganization under the Internal Revenue Code of 1939. See Koppers Co., Inc., v. United States, Ct.Cl.1955, 134 F.Supp. 290, 296–297; Rapp, "Current Problems with Carry-Overs and Carry-Backs Following Corporate Reorganizations," N.Y.U. 6th Inst. on Fed. Tax. 327, 329–30 (1948). What is conclusive, we think, is that the New Colonial case did not involve a statutory merger.

The distinction is made clear in the subsequent case of Helvering v. Metropolitan Edison Co., supra, which did not so much as cite the New Colonial decision. In the Metropolitan Edison case, a wholly-owned subsidiary corporation had issued certain bonds at a discount. Later the parent corporation absorbed the subsidiary pursuant to the provisions of a Pennsylvania statute authorizing corporate mergers, and still later the parent retired bonds of the subsidiary which it had assumed in connection with the transaction. The Supreme Court held that the parent corporation was entitled to take a deduction for the unamortized bond discount and expense on its former subsidiary's bonds. The Court pointed

to an important concession by the Commissioner:

"The petitioner concedes that if there has been a true merger or consolidation whereby the identity of the corporation issuing the bonds continues in the successor and the latter becomes liable for the debts of the former by operation of law, the successor may deduct amortization of discount and expense in respect of bonds issued by its predecessor as well as unamortized discount and expense on any of such bonds retired prior to maturity. The rule is not applicable upon a mere sale by one corporation of all its assets to another which assumes the liabilities of the former." 306 U.S. at pages 526–527, 59 S.Ct. at page 637.

After examining the transaction in the light of the statutory provisions, the Court ruled that the transfer constituted a merger in the proper meaning of that term under the applicable Pennsylvania statute. Having pointed out that under the Pennsylvania merger statute a surviving corporation automatically becomes subject to the transferor's liability, the Court concluded:

"We are of opinion that a transfer without valuable consideration, with the intent that the transferor shall, as the statute provides, cease to exist, made in accordance with the statute, has all the elements of a merger and comes within the principle that the corporate personality of the transferor is drowned in that of the transferee. It results that the continuing corporation may deduct unamortized bond discount and expense in respect of the obligations of the transferring affiliate." 306 U.S. at page 529, 59 S.Ct. at page 638.

The Court's statement that in a true statutory merger "the corporate personality of the transferor is drowned in that of the transferee" is obviously a metaphorical expression. When one is "drowned" that is the end of him as an existing legal entity. What the Court was saying, of course, was that the transferee in a statutory merger should be deemed to be continuing in itself the corporate life of the now-defunct component, and that it followed from this conceptual identity that the two corporate entities were to be treated for a substantive purpose in the income tax as the same taxpayer. This idea has proved acceptable to the Commissioner, in a number of contexts. See, *e. g.*, Bureau of Internal Revenue, Pension Trust Div., P.S.No. 62, 5 CCH 1950 Stand.Fed.Tax Rep. para. 6118, and S.Rep.No.1375, 84th Cong., 2d Sess. (1956); Rev.Rul. 54–269, 1954–2 Cum.Bull. 114; cf. Koppers Co., Inc., v. United States, Ct.Cl.1955, 134 F.Supp. 290, 295.

Appellant's contention that the principle of the Metropolitan Edison opinion should be applied to a net operating loss carry-back on the facts of the case at bar finds support in the decisions of other courts. See Stanton Brewery, Inc., v. Commissioner, 2 Cir., 1949, 176 F.2d 573; Koppers Co., Inc., v. United States, Ct.Cl. 1955, 134 F.Supp. 290; cf. E. & J. Gallo Winery v. Commissioner, 9 Cir., 1955, 227 F.2d 699. But cf. California Casket Co., 1952, 19 T.C. 32. We agree with appellant's contention, without intending to go beyond the facts of the case at bar. The opinions just cited have discussed the arguments on both sides in sufficient detail to make their repetition here unnecessary.

The judgment of the District Court is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.