**J. G. DUDLEY COMPANY, Incorporated (Formerly Headen Hosiery Mills, Incorporated), Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 8436.

United States Court of Appeals Fourth Circuit.

Argued Nov. 10, 1961.

Decided Jan. 11, 1962.

John P. Allison, New York City (Arthur L. Kimmelfield, and Marshall, Bratter, Greene, Allison & Tucker, New York City, on the brief), for petitioner.

Morton K. Rothschild, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen. and Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SOPER, BRYAN and BELL, Circuit Judges.

SOPER, Circuit Judge.

This case involves the application of the carry-over provisions of Section 122 (b) (2) (B) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 122(b) (2) (B), under which losses incurred by a

taxpayer in earlier years may be carried over and deducted in computing the taxable income in the tax year. The benefit of this section was claimed by the taxpayer in this case for the years 1954 and 1955 but was denied by the Commissioner who determined deficiencies in income tax of $3,604.47 for 1954 and $5,907.96 for 1955 which were upheld by the Tax Court under the following circumstances.

J. G. Dudley Company, Incorporated, formerly Headen Hosiery Mills, Incorporated, a North Carolina corporation, was actively engaged in the business of manufacturing hosiery at Hickory, North Carolina, from 1947 until the death of A. R. Headen, its president and principal stockholder on January 26, 1950. At that time Headen owned 348 shares, his wife 1 share, and J. G. Dudley, 1 share of the stock of the corporation. Dudley was then engaged in the plumbing, heating and air conditioning business at Shelby, North Carolina, in his individual capacity. He was a close friend of Headen who consulted him on matters of business policy and made him vice president of the taxpayer corporation. After Headen died Dudley was elected president of the corporation and managed its affairs until they could be wound up. Upon Headen's death the First National Bank of Winston-Salem was appointed executor of his estate. At that time the corporation was heavily in debt. It owed the bank between $75,000 and $80,000 and had an estimated liability of not less than $25,000 for infringement of a hosiery patent held valid by this court in Baker-Cammack Hosiery Mills v. Davis Company, 181 F.2d 550.

In this emergency it was determined by the management in February 1950, acting upon the advice of counsel, to liquidate the assets of the corporation as quickly as possible but thereafter it was decided to keep the corporation alive for at least three years after 1950 to protect the stockholders against the liability for patent infringement, until it should be barred by limitations, and also to protect them against other unforeseen liabilities that might arise. Manufacturing activities were stopped in the summer of 1950 and the sale of goods was stopped early in 1951. In October 1950 the office of the company was moved from Hickory to Shelby. In January 1952 the land and buildings of the corporation were sold and the remaining assets were thereafter sold and the proceeds devoted to the payment of the debt owing to the bank and other indebtedness. No payment was made on the liability for patent infringement. The net assets after the payment of the indebtedness were conveyed to the estate of the deceased in the purchase and cancellation on October 7, 1952 of the 348 shares of stock held by it at the price of 348/350 of the remaining net assets of the corporation.

Meanwhile in March 1952 Dudley's wife purchased the share of stock held by Mrs. Headen and a son of Dudley purchased 1 share of stock from the corporation so that in October 1952 after the 348 shares held by Headen's estate were redeemed Dudley, his wife and son were the sole stockholders, and control of the corporation was in Dudley's hands. Thereafter, nothing was done with the corporation until February 1954 when its charter was amended so as to change its name to the J. G. Dudley Company, Incorporated, and to state that the corporate purposes were to engage in the business of electrical heating, plumbing, contracting and related types of work. On February 27, 1954 Dudley purchased 10 additional shares of stock in the corporation for $1,000 and on March 1, 1954 transferred to the corporation certain assets of his plumbing and heating business in exchange for 100 shares of stock, $1,262 cash and the assumption by the corporation of the liabilities of the plumbing business theretofore conducted by Dudley. In April 1954 Dudley transferred the remaining physical assets of his business to the taxpaying corporation which thereafter became engaged in the heating and plumbing business. In 1954 and 1955 the net income of the corporation was approximately

$12,000 and $19,000 respectively. The taxpayer sought to deduct from this income losses of equal amounts which had been sustained by the corporation while engaged in the hosiery business during the years 1950 to 1953 in the aggregate sum of $52,000 but the Commissioner refused to allow these deductions as lawful carry-overs under the statute and determined deficiencies as aforesaid.

In order to show that the corporation was not acquired by Dudley for the purpose of avoiding income tax by securing the benefit of loss deductions to which he would not otherwise be entitled under the statute Dudley testified that at the time that he acquired control of the corporation he had no knowledge that the losses of the corporation in the preceding years might be used for tax purposes and that the corporation was kept alive for the protection of the stockholders as above described; and that he did not know of the carry-over advantages of such corporate losses until the year 1953 at which time he endeavored unsuccessfully to sell the corporation by advertisement in the Wall Street Journal, and that he finally determined to make use of the corporation in order to carry on his plumbing and heating business in corporate form and to transfer a share of the business to his sons. He testified, however, that in 1954 when he transferred his personal business to the corporation he knew that its earlier losses might be of some use in respect to future taxes and that this was a purpose of the incorporation although the primary purpose was to get the business in corporate form.

■ The Commissioner disallowed the loss deductions for the tax years 1954 and 1955, first, under the provisions of Section 129(a) of the Internal Revenue Code of 1939 since the holders of the capital stock of the corporation acquired control thereof for the principal purpose of evading the federal income tax by securing deductions not otherwise allowable; and second, under the provisions of Section 122 of the Internal Revenue Code of 1939 since the business which incurred the losses from 1950 to 1953 was substantially different from the business that the taxpayer operated in 1954 and 1955. On both points the Tax Court upheld the Commissioner's determinations. With respect to the first point the Tax Court, pointing out that the burden was upon the taxpayer to show that Dudley knew nothing of the tax use when he gained control of the corporation in October 1952, summarized the improbabilities of the taxpayer's evidence on this point as follows:

"The testimony relative to these reasons was the oral testimony of Dudley and an officer of the bank which became Headen's executor. The alleged patent infringement claims were said to be evidenced by letters which had been destroyed and could not be produced. The alleged agreement to keep the corporation alive was supported only by oral testimony of these same witnesses and was said to have been based on legal advice. No corroborative written evidence was offered and the lawyer who gave such advice was not called. Furthermore, we are not persuaded that the alleged purpose could have been accomplished by keeping the corporation alive after its assets had been used to cancel Headen's majority stock. As to the purpose of putting Dudley's proprietorship in corporate form, this could as easily have been done by forming a new corporation though Dudley testified he did not do this, because it would have cost some $300. In this respect we note that, just before he transferred his proprietorship to the petitioner he acquired 10 additional shares at a total cost of $1,000. It is not apparent as to why it would have cost more to form a new corporation than to effect the transfer of his proprietorship to the old in the manner he did. Furthermore, before the transfer was effected, Dudley had attempted to dispose of the corporate shell of the old corporation in 1953 through

an advertisement in the Wall Street Journal. This is hardly consistent with a primary purpose to keep the old corporation alive so that he could transfer to it his proprietorship assets. We note also that this latter move was made at a time when Dudley had consulted an attorney and admittedly knew that the previous losses of the corporation might be used to tax advantage. In short, we place little credence in the reasons thus advanced and no matter whether Dudley is considered as having gained control of petitioner in 1952 when he and his wife and son remained the only stockholders, at 1 share each, after Headen's stock was cancelled, or later, in 1954 when he purchased an additional 10 shares, we hold the petitioner has not carried its burden of showing the Commissioner's determination to be erroneous."

The Tax Court's inability to give credence to the testimony of Dudley and the officer of the bank, executor of the Headen estate, finds support in the evidence. The testimony on behalf of the taxpayer indicates that Dudley thought that the claim of the patentee would be barred at the end of 1953; but the lawyer who advised him was not called as a witness and no reference is given to the Statute of Limitations on which reliance was placed. Infringement of the patent by the corporation must have continued as long as it manufactured or sold any of the infringing goods, that is until some time in the year 1951, and recovery for infringement would not have been barred under the patent statute, 35 U.S.C. Section 286, until six years later, long after Dudley began to conduct his plumbing business under the aegis of the corporation. Limitations upon a claim of liability of the Headen estate and its beneficiaries for the moneys received in the liquidation of the corporation to the prejudice of the owner of the patent would seem to be governed by the law of North Carolina. The rule of that state,

as set out in Park Terrace, Inc. v. Burge, 249 N.C. 308, 106 S.E.2d 478, 481, and now codified in the Code of North Carolina. G.S. § 55–54, imposes liability on shareholders for amounts received by distribution or redemption of stock at a time when the corporation is unable to pay its debts, and no applicable North Carolina statute has been found which limits the period in which such an action may be commenced to less than three years from the time the cause of action accrued. See Code of North Carolina, G.S. § 55–54 and G.S. § 55–32(m) enacted in 1955; G.S. §§ 1–52 and 1–15, and (c.f.) G.S. § 55–116 and G.S. § 1–50, applicable during the time here pertinent. As the distribution in this case took place in October 1952 the claim of the patentee would not have been barred until well after Dudley began to conduct his business operations in corporate form. The explanation for the continuance of the corporate existence is obviously inconsistent with the law and the facts in the case.

Under these circumstances it is not surprising that the Tax Court refused to accept the taxpayer's testimony. Moreover, the explanation offered by the taxpayer runs counter to Dudley's actions, if the sole purpose of keeping the corporation alive was to protect the Headens from suit. The simplest procedure would have been to retain Mrs. Headen as a stockholder, but instead complete control was shifted to the Dudleys by the purchase of Mrs. Headen's one share by Mrs. Dudley and the purchase of another share from the corporation by Dudley's son. It is a fair inference from these facts that Dudley acquired control of the corporation for his own purposes and that these purposes became clear when he attempted to sell the loss use of the Corporation in 1953 and made use of it himself to reduce the income taxes of his business in 1954 and 1955.

The second reason given by the Commissioner and approved by the Tax Court for the determination of the de-

ficiencies is in accord with current decisions. The business of the taxpayer in the pending case, which incurred the losses in 1951–1953, was entirely different from the business of the corporation that produced the taxable income in 1954 and 1955. The bearing of this fact upon the right of the taxpayer to deduct carry-over losses is established by the decision of the Supreme Court in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924, where a corporation formed by the merger of 17 separately incorporated businesses was denied the right to deduct the pre-merger losses of three of the constituent corporations from its post-merger income. In presenting the case the Government contended that the loss carry-over should be denied because the merged corporation was not the same entity as the constituent corporations, while the taxpayer argued that it should be treated as the same corporate taxable entity as the constituents to whose legal attributes it had succeeded; but the court refused to pass on this question and based its decision squarely on the ground that a continuity of business enterprise was not shown. It held that a prior year's loss can be offset against the current year's income only to the extent that the income is derived from the operation of substantially the same business which produced the loss. The evidence showed that the 17 premerger businesses reported their income separately and that three of them were operated at a loss and the court pointed out that if the new corporation were allowed to deduct carry-over losses the 17 former businesses would secure an opportunity that they elected to forego when they chose not to file a consolidated return.

In explanation of its decision, the court said, page 386, 77 S.Ct. 993:

"The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business."

In reaching this decision the court cited with approval the decision in Newmarket Manufacturing Co. v. United States, (1st Cir.), 233 F.2d 493, 497, (cert. denied 353 U.S. 983, 77 S.Ct. 1279, 1 L.Ed.2d 1142), where the loss carry-over privilege was granted to a taxpayer corporation originally incorporated in Massachusetts which carried on the same business throughout the period but changed its corporate identity by reincorporating in the State of Delaware. Therein the court reached the conclusion that the concern of Congress was not to bring stability to the tax burden of an artificial legal entity called a corporation but rather that of the human beings doing business behind the corporate facade.

Subsequent decisions of the Courts of Appeals have understood the Libson decision to mean that the continuity of the same business rather than the continuity of the same corporate structure is the test of the right of a taxpayer to deduct losses incurred in a previous year. Thus, in F. C. Donovan, Inc. v. United States (1st Cir.), 261 F.2d 470, the loss carryback provision was accorded to a corporate leather wholesaler which acquired the assets and assumed the liabilities of a plastic products subsidiary and thereafter carried on the businesses in sepa-

rate leather and plastic divisions; whereas, in Commissioner of Internal Revenue v. Virginia Metal Products, Inc. (3rd Cir.), 290 F.2d 675, the loss carry-over privilege was denied where losses were incurred by a corporation engaged in the business of making aluminum storm windows and doors, and an attempt was made to deduct these losses from the income derived from the operation of an entirely new business after the old business had been abandoned and its corporate shell was acquired by new owners under whose control the new business was operated. This case, and that of Mill Ridge Coal Co. v. Patterson (5th Cir., 1959), 264 F.2d 713, which reached a similar result, is strikingly like that at bar insofar as the new owners of a new business make use of a corporate shell in an attempt to deduct from its income losses previously incurred by a different business operated under the same corporate structure by different owners.

The taxpayer also contends that since the loss deductions are claimed for the years 1954 and 1955 the case is governed by Section 172 of the 1954 Code rather than Section 122(b) (2) (B) of the Code of 1939, and that the 1954 Code has made the Libson rule inapplicable. There is, however, no difference in the purpose of the two sections in respect to the question under consideration, even if we assume that the 1954 Act applies. It is fantastic to suppose that Congress, in carrying out its purpose to lighten the burdens of the taxpayer incident to the annual accounting system by offsetting losses of bad years against profits of good years, should have intended to permit a corporate taxpayer under new ownership to offset the losses of an earlier unsuccessful enterprise against the gains of a totally different enterprise subsequently undertaken. The legislative history as shown by the Congressional Committee reports is to the contrary. See 3 U.S.C. Cong. & Adm.News, (1954) pp. 4067, 4684.

Affirmed.