## THERMATOOL CORPORATION *v.* DEPARTMENT OF REVENUE SERVICES ET AL.

SUPERIOR COURT          TAX SESSION          FILE NO. 397787

Memorandum filed July 7, 1994

*Alphonse Ippolito,* for the plaintiff.

*Paul M. Scimonelli,* assistant attorney general, with whom was *Richard Blumenthal,* attorney general, for the defendants.

BLUE, J. A corporation, it has been said, has no body to kick and no soul to damn.[1] Thermatool Corporation, the plaintiff in this tax appeal, may have no body to kick, but it has changed its corporate form enough to raise a difficult legal problem. After first merging with another corporation, it was later spun-out and reincorporated under its premerger name. The question presented in this case is whether it can take advantage of a net operating loss incurred by its premerger predecessor. After an examination of all of the relevant circumstances, I conclude that it may properly do so.

The parties in this case have submitted a written stipulation of facts. In addition, a number of documentary exhibits and the testimony of some corporate officials were submitted at an evidentiary hearing. From these submissions, the following facts are found.

Prior to 1984, a New Jersey corporation named Inductotherm Industries, Inc. ("Industries") had two wholly owned subsidiary corporations: Thermatool Corporation ("Thermatool I") and Inductotherm Corporation ("Inductotherm"). The relationship of these corporations is represented by the following chart:

Inductotherm is a New Jersey corporation. Thermatool I was incorporated in Connecticut in 1974. It engaged in the specialized business of making high frequency welding equipment. During the tax years ending April 30, 1993, and April 30, 1984, it incurrred substantial net operating losses.

These losses made Thermatool I an attractive merger prospect for federal income tax purposes. On May 1,

---

[1] The aphorism has been attributed to a number of different authors. See S. James & C. Stebbings, A Dictionary of Legal Quotations (1987), pp. 24–25.

1984, Thermatool I and Inductotherm merged. This was a statutory merger[2] in which Inductotherm became the surviving corporation. The directors and officers of Inductotherm became the directors and officers of the surviving corporation. The certificate of incorporation and bylaws of Inductotherm likewise became the certificate of incorporation and bylaws of the surviving corporation. Both corporations, as already mentioned, had been wholly owned by Industries. The shares of Inductotherm became the shares of the surviving corporation. The shares of Thermatool I were surrendered and automatically cancelled. The post-merger relationship of the corporations in question is represented by the following chart:

It is clear from the evidence that this was entirely a marriage of convenience for federal tax purposes only. Inductotherm deducted the net operating loss carried forward from Thermatool I on its federal income tax return for the fiscal year ending April 30, 1985, pursuant to § 381 of the Internal Revenue Code of 1954.

---

[2] A "statutory merger" occurs when "one corporation absorbs the corporate enterprise of another corporation, with the result that the acquiring company steps into the shoes of the disappearing corporation as to its assets and liabilities." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders (5th Ed. 1987), ¶ 14.12, p. 14-32. Such a merger is sometimes referred to as a "type (A) reorganization," after § 368 (a) (1) (A) of the Internal Revenue Code of 1954. Section 368 (a) (1) categorizes seven kinds of corporate reorganization, including statutory mergers. Each type of reorganization is referred to by the subsection letter that precedes it. A type (A) reorganization is distinguished, for example, from a type (B) reorganization, which is a stock-for-stock acquisition of another corporation, and a type (C) reorganization which is a stock-for-assets acquisition.

It is conceded that Inductotherm could not deduct this loss on its Connecticut corporation business tax return. See *Golf Digest/Tennis, Inc.* v. *Dubno,* 203 Conn. 455, 525 A.2d 106 (1987) (*Golf Digest*). Apart from the federal tax return and the legal formalities of the merger already mentioned, however, the business enterprise that had been performed by Thermatool I (now known as "the Thermatool Division of Inductotherm Corporation") retained an ongoing, separate existence. It had what the written stipulation refers to as "separate and continued management." It was recognized to be a separate division of Inductotherm. Its employees did not change, apart from normal turnover. Its clientele did not change, and its business did not change. Employees and customers dealing with the business would not have noticed the difference except for minor changes in the corporate stationery and paycheck stubs. In addition, the ultimate owner of the business, Industries, remained constant.

By the close of the fiscal year ending April 30, 1985, the merger had accomplished its limited purpose. There being no other magic in the marriage, the union was quickly dissolved. On May 1, 1985, in the words of the stipulation, "the Plaintiff, Thermatool Corporation, was spun-out in its entirety as a separate corporation, continuing as a wholly owned subsidiary of Inductotherm Industries, Inc." In practice, it was explained at the hearing, this meant that a new corporation was incorporated in Connecticut under the name of Thermatool Corporation. This "Thermatool Corporation," which is the plaintiff in this case, will hereinafter be referred to as "Thermatool II." The assets and liabilities of the Thermatool Division of Inductotherm Corporation were transferred to Thermatool II by Inductotherm in exchange for all of Thermatool II's stock. Inductotherm then declared a stock dividend and transferred this

stock to Industries. The relationship of the corporations after the spin-out is represented by the following chart:

It is clear from the evidence that, apart from the legal changes just mentioned, the spin-out did not affect the business enterprise of Thermatool II. That business continued to be the same as it had been not only prior to the spin-out but prior to the preceding merger. The assets, employees, customers, and stock ownership of the company were unaltered. In fact, it appears from the evidence that the only difference between Thermatool I and the Lazarus-like Thermatool II is the fact that they have different certificates of incorporation.

But is Thermatool I the same entity as Thermatool II for purposes of the Connecticut corporation business tax? This question has arisen because Thermatool II wishes to deduct the premerger net operating losses of Thermatool I. The department of revenue services (department) disallowed such a deduction, and this appeal followed.

"Unlike § 381 of the Internal Revenue Code of 1954, [General Statutes] § 12-217 does not specifically address the question of the ability of a surviving corporation to deduct as a carryover the net operating losses attributable to a consolidated corporation." *Golf Digest,* supra, 203 Conn. 460. Section 12-217 provides that operating losses "shall be deductible . . . in each of the five income years following [the] loss year," but the language just quoted does not address the question of who, if anyone, may deduct the losses of a merged corporation. The rather lengthy text of § 12-217 elsewhere refers to "the taxpayer," and it is safe to assume

that any losses that are, in fact, deductible, will be deducted by "the taxpayer," but this, too, does not address the question of what losses may be deducted by a merged (or spun-out) corporate "taxpayer." The ultimate question that must be asked under the statute is whether the "taxpayer" deducting the loss is the "taxpayer" that incurred the loss. See *Libson Shops, Inc.* v. *Koehler,* 353 U.S. 382, 385, 77 S. Ct. 990, 1 L. Ed. 2d 924, reh. denied, 354 U.S. 943, 77 S. Ct. 1390, 1 L. Ed. 2d 1542 (1957) (construing the textually analogous Internal Revenue Code of 1939). To phrase the question in this way, however, begs the crucial question of how, in a corporate case such as this one, the word "taxpayer" is to be defined.

*Golf Digest* provides some guidance in this area. That case involved the merger of two corporations, Golf Digest, Inc., and Tennis Features, Inc. The surviving corporation attempted to deduct the premerger operating losses of Tennis Features, Inc. The Connecticut Supreme Court held that § 12-217 did not allow such a deduction. The court first explained that it was inappropriate to refer to § 381 of the Internal Revenue Code of 1954, which specifically addresses the question of carryovers in certain corporate acquisitions, to resolve the problem. That statute is "a substantive provision that creates legal rights apart from those set forth in the operating loss carryover provisions of § 172 of the Internal Revenue Code." *Golf Digest,* supra, 203 Conn. 462.

*Golf Digest* then explained that it would be "[m]ore instructive" to examine the federal resolution of the merger issue "under the Internal Revenue Code of 1939, which, like our current corporation business tax, provided no express governing provision." Id. The court specifically referred to *Libson Shops,* in which the Supreme Court of the United States articulated a "continuity of business enterprise" test. This test looks

to whether the income against which a deduction has been taken "is derived from the operation of substantially the same business which produced the loss." *Libson Shops, Inc.* v. *Koehler,* supra, 353 U.S. 386. This test could not be met by the consolidated corporation at issue in *Golf Digest. Golf Digest,* supra, 203 Conn. 463.

The *Golf Digest* court finally noted that § 12-217, as a statute setting forth a deduction, must be strictly construed against the taxpayer and that, "[i]n order to prevail in light of this rule of construction, the plaintiff must establish that § 12-217 clearly and unambiguously authorizes a surviving corporation to claim a deduction for the operating losses that had been incurred by an acquired corporation prior to the consolidation." Id., 465. This the taxpayer at issue in *Golf Digest* could not do.

*Golf Digest* does not, however, resolve this case. The consolidated business at issue in *Golf Digest* was not substantially the same business that had produced the loss. It was, consequently, not the "taxpayer" that had incurred the loss for purposes of § 12-217. Here, however, Thermatool II *is* substantially the same business as Thermatool I. The shareholder (Industries) is the same, the assets are the same, the employees are the same (adjusting for normal turnover), and the business enterprise is the same. The problem is that, at least from a technical point of view, the *corporations* are not the same. The existence of a corporation "begins from the time the secretary of the state endorses the certificate of incorporation." *Karanian* v. *Maulucci,* 185 Conn. 320, 324, 440 A.2d 959 (1981). Under these circumstances is Thermatool II the same "taxpayer" as Thermatool I for purposes of § 12-217?

There are two competing analyses to be considered: the formalistic and the functional. The department

takes a formalistic approach. Thermatool I and Thermatool II are, in its view, distinct corporations. If the legislature had intended to provide for relief in this situation, it could have done so. Section 12-217 does not, however, clearly and unambiguously authorize a deduction under these circumstances and, as the department sees it, that is the end of the case. In contrast, the functional approach taken by Thermatool II looks to the underlying reality of the situation and the policy concerns of the statute. In every sense but the formal, Thermatool II reasons, it is the same taxpaying entity as Thermatool I, and there is no policy reason to deny it the deduction that Thermatool I unquestionably could have claimed.

The formalistic view has undeniable attractions. Great as the similarities between Thermatool I and Thermatool II are, the corporations are distinct legal entities. Thermatool II, the taxpayer in this case, did not exist when Thermatool I incurred the operating losses in question. Moreover, to use the language of *Golf Digest*, § 12-217 does not "clearly and unambiguously" authorize the deduction claimed here. The statutory text gives no indication that the legislature ever thought about the problem at hand. While that text may provide some clues as to how the problem should be resolved, it contains nothing approaching an unambiguous answer.

A strong argument can be made that this should be the end of the matter. *Golf Digest* states that a deduction cannot be claimed unless § 12-217 clearly and unambiguously authorizes it, and this precondition—if it is a precondition—simply cannot be established. Upon reflection, however, I find the argument in favor of the functional approach to be even more forceful. *Golf Digest* teaches that the federal resolution of this issue under the Internal Revenue Code of 1939 is instructive, and research reveals that federal judges and distinguished commentators considering the 1939

Code ultimately rejected the formalistic approach for sound and convincing reasons. In interpreting a statute, we are to be "mindful that the legislature is presumed to have intended a just and rational result." *Vaillancourt* v. *New Britain Machine/Litton,* 224 Conn. 382, 391, 618 A.2d 1340 (1993). Adoption of the functional approach will achieve such a result, whereas the now-discarded formalistic approach will not. I believe that, ultimately, the functional approach is more faithful to Connecticut Supreme Court precedent and will produce a fairer and more sensible result in this case.

A review of the historical developments in this area is extremely instructive. The Revenue Act of 1924 empowered the Internal Revenue Service to reallocate income and deductions among related taxpayers in order to prevent avoidance of taxes and to reflect income clearly. The Internal Revenue Code of 1939, which as *Golf Digest* notes was similar to Connecticut General Statutes § 12-217, additionally restricted the use of net operating losses to "the taxpayer" who sustained the loss. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders (5th Ed. 1987) ¶ 16.02, p. 16-5 (hereinafter "B. Bittker & J. Eustice").

The Supreme Court of the United States first encountered the problem of acquired corporations with preaffiliation net operating losses in *Woolford Realty Co.* v. *Rose,* 286 U.S. 319, 52 S. Ct. 568, 76 L. Ed. 2d 1128 (1932). The Woolford Realty Company had purchased 96 percent of the stock of a second corporation with substantial preacquisition losses. The Supreme Court held that the acquiring corporation could not deduct those losses. It termed the taxpayer's arguments "not lacking in plausibility"; id., 329; but feared that "[a] different ruling would mean that a prosperous corporation could buy the shares of one that had suffered heavy losses and wipe out thereby its own lia-

bility for taxes." Id., 329–30. The court reasoned that, "[t]o such an attempt the reaction of an impartial mind is little short of instinctive that the deduction is unreasonable . . . ." Id., 330.

Two months after *Woolford Realty,* the Second Circuit decided the much-cited case of *Commissioner of Internal Revenue* v. *Sansome,* 60 F.2d 931 (2d Cir.) (Learned Hand, J.), cert. denied, 287 U.S. 667, 33 S. Ct. 291, 77 L. Ed. 575 (1932). *Sansome* involved a corporation that had acquired the assets of another corporation in return for stock. The acquired corporation had a surplus in earnings and profits available for distribution. The acquiring corporation later liquidated, and the question arose as to the proper treatment of the acquired corporation's earnings and profits. The Second Circuit held that those earnings and profits retained their status as such and were taxable to the recipients as dividends. See *Commissioner* v. *Phipps,* 336 U.S. 410, 411, 69 S. Ct. 616, 93 L. Ed. 771 (1949). *Sansome* is of interest here because of its treatment of the formalistic argument advanced by the taxpayer that the two corporations were distinct entities and should be treated as such. This, the Second Circuit said, raised "a troublesome question that the courts had beclouded by recourse to such vague alternatives as 'form' and 'substance,' anodynes for the pains of reasoning." *Commissioner of Internal Revenue* v. *Sansome,* supra, 933. It was instead appropriate to inquire whether the reorganization in question "toll[ed] the company's life as continued venture." Id.

Because *Sansome* was concerned with the need to prevent tax avoidance on an absorbed corporation's accumulated earnings, its "continued venture" test was not immediately influential in determining the extent to which other corporate tax attributes survive a corporate reorganization. B. Bittker & J. Eustice, supra, ¶ 16.02, pp. 16-7–16-8. The Supreme Court revisited

the latter area two years later in *New Colonial Ice Co.* v. *Helvering,* 292 U.S. 435, 54 S. Ct. 788, 78 L. Ed. 1348 (1934), and, once again, formalism was triumphant. *New Colonial* involved a newly formed corporation that had acquired the assets of an older corporation in return for stock. The older corporation continued to exist, albeit without business, assets, or income. The Supreme Court held that the new corporation could not deduct the net operating losses of the old one. The continuity of business was not an important consideration. Id., 439. Instead, the court looked to whether the taxpayer was "a distinct corporate entity." Id., 441. The identity of the stockholder was also unimportant, since "a corporation and its stockholders are deemed separate entities." Id., 442.

The *New Colonial* "corporate entity" theory is the very same formalistic analysis advocated by the department in the present case. That doctrine did not, however, have a happy history. During the two decades that it dominated the reorganization scene, "well-advised taxpayers tried to arrange to have the loss corporation emerge as the surviving corporation in a reorganization transaction so that its loss carryovers . . . would be preserved; this in turn led to some unwieldy amalgamations, and instances of 'minnows swallowing whales' were fairly common during this period." B. Bittker & J. Eustice, supra, ¶ 16.02, p. 16-7. The doctrine "was not equitable and did not comport with market reality." *Fieldcrest Mills, Inc.* v. *Coble, Secretary of Revenue,* 290 N.C. 586, 592, 227 S.E.2d 562 (1976). It "penalized only poorly advised taxpayers and those who for nontax reasons found it necessary to extinguish the loss entity." Note, "Net Operating Loss Carryovers and Corporate Adjustments: Retaining an Advantageous Tax History under Libson Shops and Sections 269, 381, and 382," 69 Yale L.J. 1201, 1211 (1960).

In *Helvering* v. *Metropolitan Edison Co.,* 306 U.S. 522, 59 S. Ct. 634, 83 L. Ed. 957 (1939), however, tax

attributes were held to carry over to a successor corporation where the reorganization took the form of a statutory merger. The issue in *Metropolitan Edison* was the successor corporation's right to deduct unamortized bond discount on its predecessor's obligations assumed by operation of law in the merger. Because the merger was a statutory one, the court stated that "the corporate personality of the transferor is drowned in that of the transferee." Id., 529.

*Metropolitan Edison* proved to be a considerably more attractive precedent for the lower federal courts, at least in statutory merger cases, than *New Colonial*. See *E. & J. Gallo Winery* v. *Commissioner of Internal Revenue,* 227 F.2d 699 (9th Cir. 1955); *Stanton Brewery* v. *Commissioner of Internal Revenue,* 176 F.2d 573 (2d Cir. 1949); *Koppers Co.* v. *United States,* 134 F. Sup. 290 (Ct. Cl. 1955), cert. denied, 353 U.S. 983, 77 S. Ct. 1279, 1 L. Ed. 2d 1142 (1957). The First Circuit initially attempted to reconcile the two Supreme Court precedents in *Newmarket Mfg. Co.* v. *United States,* 233 F.2d 493 (1st Cir. 1956), cert. denied, 353 U.S. 983, 77 S. Ct. 1279, 1 L. Ed. 2d 1142 (1957). That attempt, as will be seen, was later renounced by its author as unrealistic, but the analysis that accompanied it remains instructive.

*Newmarket Mfg. Co.,* like *Metropolitan Edison,* involved a statutory merger. Here the issue was a carryback provision of the Internal Revenue Code of 1939, which allowed a taxpayer to carry back a net operating loss of one fiscal year as a deduction against income earned in the preceding year. The surviving corporation in *Newmarket Mfg. Co.* was a Massachusetts corporation that had merged with its wholly owned Delaware subsidiary. The business conducted by the enterprise had not changed, but the government argued that the fact that these were distinct legal entities was fatal.

The First Circuit rejected this contention and what it termed the "logic-chopping, fine-spun distinctions, and dubious arguments by analogy" that went with it. *Newmarket Mfg. Co.* v. *United States,* supra, 233 F.2d 496. The court instead looked to the policy behind the carryback departure from the general system of a strict annual accounting: "There was a desire to bring stability to the tax burden of 'a business with alternating profit and loss.' H.R. Rep. No. 855, 76th Cong., 1st Sess., 9-10 (1939). Whose burden? That of an artificial legal entity called a corporation, or that of the human beings doing business behind the corporate facade, and who, alone, actually feel the pinch of taxation? When, as here, everything in the business remains the same, except for the change of corporate domicile from Massachusetts to Delaware, the answer as an a priori matter seems easy: Income-tax-wise, there is no more reason why the Congress should choose to attach crucial significance to a mere change of corporate domicile than it would to a change of an individual taxpayer's domicile from Massachusetts to Delaware. It is important also to observe in the present case that throughout the whole period in question there was only one single business—the business of manufacture and sale of woven synthetic fibers—which had a profitable year followed by several bad ones." Id., 497. This policy analysis, moreover, was not foreclosed by *New Colonial.* The old corporation in that case "remained technically in existence, the reorganization having been accomplished not as a statutory merger but solely on a contractual basis." Id., 498. The controlling case was, instead, *Metropolitan Edison,* which, like *Newmarket Mfg. Co.,* had involved a statutory merger. The statement in *Metropolitan Edison* that in a statutory merger " 'the corporate personality of the transferor is drowned in that of the transferee' " the First Circuit observed, "is obviously a metaphorical expression."

*Newmarket Mfg. Co.* v. *United States,* supra, 499. The court explained that: "[w]hen one is 'drowned' that is the end of him as an existing legal entity. What the Court was saying, of course, was that the transferee in a statutory merger should be deemed to be continuing in itself the corporate life of the now-defunct component, and that it followed from its conceptual identity that the two corporate entities were to be treated for a substantive purpose in the income tax as the same taxpayer." Id.

One year after *Newmarket Mfg. Co.,* in *Libson Shops,* "the Supreme Court overturned (or ignored) several well-settled assumptions in this area . . . ." B. Bittker & J. Eustice, supra, ¶ 16.02, p. 16-9. The taxpayer in *Libson Shops* had been incorporated to provide management services for corporations selling women's apparel at retail. "At about the same time, the same interests incorporated 16 separate corporations to sell women's apparel at retail at separate locations." *Libson Shops, Inc.* v. *Koehler,* supra, 353 U.S. 383. The sixteen sales corporations were subsequently merged into the management corporation. The surviving corporation attempted to carry forward net operating losses of three of the sales corporations. The goverment argued against the deduction, citing the entity theory of *New Colonial.* The taxpayer, on the other hand, argued that the statutory merger analysis of *Metropolitan Edison* was controlling.

The Supreme Court found it "unnecessary to discuss this issue since an alternative argument made by the Government is dispositive of this case. The Government contends that the carry-over privilege is not available unless there is a continuity of business enterprise." *Libson Shops, Inc.* v. *Koehler,* supra, 353 U.S. 386. The court found that "[t]he requirement of a continuity of business enterprise . . . is in accord with the legislative history of the carry-over and carry-back provi-

sions." Id. It concluded that the taxpayer "is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same business which incurred the losses." Id., 390.

*Libson Shops* "stirred up a hornet's nest of confusion." B. Bittker & J. Eustice, supra, ¶ 16.02, p. 16-9; compare, e.g., *Patten Fine Papers* v. *Commissioner of Internal Revenue,* 249 F.2d 776 (7th Cir. 1957) (the *New Colonial* entity theory controls in a stock-for-assets acquisition), with *Old National Bank in Evansville* v. *Commissioner of Internal Revenue,* 256 F.2d 639 (7th Cir. 1958) (disregarding the entity theory in a case involving a statutory merger). Were *New Colonial* and *Metropolitan Edison* both good law? Did the "business enterprise" test replace the "corporate entity" test or stand as an additional barrier? The First Circuit addressed these questions in *F. C. Donovan, Inc.* v. *United States,* 261 F.2d 470 (1st Cir. 1958), an opinion by Chief Judge Magruder, the author of *Newmarket Mfg. Co. F. C. Donovan* involved a stock-for-assets acquisition by a parent corporation of its wholly-owned subsdiary. The subsidiary technically remained in existence, and *New Colonial,* to the extent that it remained viable, was consequently controlling. But the business in question had remained unchanged. The First Circuit held in *F. C. Donovan* that, under these circumstances, *New Colonial* could not be considered controlling: "Once one gets over the hurdle, as we did in the Newmarket case, that the carry-back privilege is available only where the identical 'legal entity' which had earned the income suffered the loss, it would seem a sterile technicality, and wholly unrealistic, to impute to the Congress an intention . . . to make the loss carry-back dependent upon the mere form in which the reorganization is cast, that is, whether or not the reorganization was effected by means of a 'statutory merger' under state law." Id., 475.

*F. C. Donovan* went on to explain that, in light of *Libson Shops,* neither *New Colonial* nor *Metropolitan Edison* could be considered good law. The distinction between statutory mergers and other forms of corporate reorganization was "no longer satisfactory." Id., 476. Similarly, "it is no longer proper to rely upon the metaphorical concept" in *Metropolitan Edison* that in a statutory merger " 'the corporate personality of the transferor is drowned in that of the transferee.' " Id. Instead, in the First Circuit's estimation, the true policy was to be found in the provisions of the Internal Revenue Code, introduced several years after *New Colonial,* that allowed certain types of reorganizations to be tax free as to the corporations. "It was the obvious and stated purpose of the Congress to encourage businessmen to effectuate certain types of tax-free reorganizations for adequate business reasons, unaffected by a fear of adverse federal tax consequences." Id. A negation of the carry-back privilege that otherwise existed would defeat "the essential purpose of the Congress in enacting the provisions for tax-free reorganizations." Id.

In Rev. Rul. 59-395, 1959-2 C.B. 475, the Internal Revenue Service announced a middle of the road position. Unlike in *F.C. Donovan,* it viewed the *New Colonial/Metropolitan Edison* distinction between statutory mergers and other forms of consolidation as a viable one. But, while corporate reorganizations other than statutory mergers could not result in carryovers or carrybacks of net operating losses, statutory mergers were now viewed in a much more favorable light: "[F]ollowing a statutory merger or consolidation, the premerger or preconsolidation net operating losses . . . of an absorbed constituent corporation may be carried over to the resultant corporation to the extent that such losses . . . offset income of the resultant corporation attributable to assets acquired by it from

the absorbed constituent and used in continuing the pre-fusion business of such absorbed constituent . . . ." Rev. Rul. 59-395, supra, 479. At least as far as statutory mergers were concerned, the Internal Revenue Service had abandoned the entity theory.

Following *F.C. Donovan* and Revenue Ruling 59-395, the federal courts essentially abandoned the entity theory as well. They repeatedly held that "[i]t is the continuity of the same business rather than the continuity of the same corporate structure which is the test for allowing deductions of losses sustained in prior years." *Federal Cement Tile Co.* v. *Commissioner of Internal Revenue,* 338 F.2d 691, 693 (7th Cir. 1964); accord *J. G. Dudley Co.* v. *Commissioner of Internal Revenue,* 298 F.2d 750, 754 (4th Cir. 1962). The United States Court of Claims articulated a particularly useful analysis in *Westinghouse Air Brake Co.* v. *United States,* 342 F.2d 68 (Ct. Cl. 1965). That court viewed the crucial question as whether the carryback or carryover in question "could have been utilized if there had been no merger." Id., 73. It explained that, "[*Libson Shops*] seemed to say that the availability of carryovers should not be affected by the occurrence of a merger provided that the continuity of business test is met. In postulating this test, the Court markedly departs from the formalism of the entity theory requirement of the same taxpayer and stresses the business unit concept contained in the continuity of business test." Id.

This review establishes that not only has Congress formally abandoned the entity theory by enacting § 381 of the Internal Revenue Code of 1954, but both federal courts and the Internal Revenue Service have abandoned this theory in their respective interpretations of the Internal Revenue Code of 1939. It is true that *New Colonial* has never been formally overruled. *Libson Shops* can be read as retaining the entity theory and adding a second hurdle. But neither the lower

federal courts nor the Internal Revenue Service has read *Libson Shops* in this way. Instead, the entity theory has been repeatedly condemned as unduly formalistic, as oblivious to business reality, and as frustrating the legislative will. In addition, as Bittker and Eustice point out, the practical effect of an adoption of the entity theory will be "unwieldy amalgamations" and " 'minnows swallowing whales.' " B. Bittker & J. Eustice, supra, ¶ 16.02, p. 16-7.

In any event, the usefulness of the federal precedent just discussed lies not in its doctrinal consistency but in its capacity to instruct. My task is to interpret General Statutes § 12-217 in a just, rational, and sensible way. In doing so, it is surely permissible to notice that the formalistic approach advocated by the department in this case has been weighed in the balances of the federal judiciary and found wanting. It can be justified only by sterile technicalities that a host of federal judges and distinguished commentators have well-nigh universally rejected. Neither *Golf Digest* nor the text of § 12-217 mandates the formalistic approach. Because of these considerations, I am convinced that the functional approach should be adopted.

To return to the facts of this case, I have found that Thermatool I and Thermatool II are, for all practical purposes, the same business enterprise. There is no question that the carryover in question could have been utilized had the statutory merger with Inductotherm, now undone, never occurred. Because, under these somewhat peculiar circumstances, the continuity of business enterprise test is fully satisfied, it follows that Thermatool II is the same "taxpayer" as Thermatool I and should be allowed to deduct the carryover from Thermatool I against its income.

Judgment shall enter for the plaintiff. The parties are requested to submit proposed orders consistent with this decision with thirty days of the date of filing.