REO MOTORS, INC. *v.* COMMISSIONER OF
INTERNAL REVENUE.

No. 59.   Argued November 10, 14, 1949.—Decided January 9, 1950.

*James O. Wynn* argued the cause for petitioner. With him on the brief was *N. Barr Miller*.

*Oscar H. Davis* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle, Ellis N. Slack* and *Melva M. Graney*.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

An asserted conflict between the decision below and that of the Court of Appeals for the Fifth Circuit in *Commissioner* v. *Moore, Inc.,* 151 F. 2d 527, made this an appropriate case for our review on writ of certiorari.[1] A recital of the facts must precede definition of the issue.

Petitioner is a Michigan corporation engaged in the manufacture of motor vehicles. On February 1, 1941, Reo Sales Corp., a wholly-owned subsidiary, was dissolved and all of its assets, subject to all its liabilities, were transferred to petitioner. At the date of dissolution, Reo Sales was indebted to petitioner in an amount greater than the value of its net assets. Consequently, its stock, which had an adjusted basis in petitioner's hands of $1,551,902.79, was worthless. This loss was a long-term capital loss under the law applicable in 1941.[2] It was so claimed by petitioner and allowed by the Commissioner.

Petitioner realized no gains from the sale or exchange of capital assets in 1941. Its gross income amounted to $2,573,259.89, while allowable deductions under Chapter 1 of the Internal Revenue Code, exclusive of the capital loss on Reo Sales stock, amounted to $2,215,727.08. With the Reo Sales stock loss included, petitioner's allowable deductions exceeded its gross income by $1,194,369.98.

---

[1] 337 U. S. 923.

[2] Section 23 (g) of the Internal Revenue Code, 26 U. S. C. (1940 ed.) § 23 (g).

Under the tax laws applicable in 1941, petitioner's capital loss on Reo Sales stock could not have been utilized as a net operating loss to be carried over to subsequent years. Section 122 (a) of the Code defines "net operating loss" as "the excess of the deductions allowed by this chapter over the gross income, with the exceptions and limitations provided in subsection (d)." [3] The exceptions outlined in § 122 (d) included the following, which is pertinent here:

"(4) Long-term capital gains and long-term capital losses shall be taken into account without regard to the provisions of section 117 (b). As so computed the amount deductible on account of long-term capital losses shall not exceed the amount includible on account of the long-term capital gains, and the amount deductible on account of short-term capital losses shall not exceed the amount includible on account of the short-term capital gains; . . . ." [4]

---

[3] Section 122 (a) was amended by § 105 (e) (3) of the Revenue Act of 1942 to read ". . . with the exceptions, *additions*, and limitations provided in subsection (d)." (Italics added.)

[4] Section 122 (d) (4) was amended by § 150 (e) of the Revenue Act of 1942 to read as follows:

"(4) Gains and losses from sales or exchanges of capital assets shall be taken into account without regard to the provisions of section 117 (b). As so computed the amount deductible on account of such losses shall *not* exceed the amount includible on account of such gains."

It was this amendment that was involved in *Commissioner* v. *Moore, Inc.*, 151 F. 2d 527. In 1941 Moore had a long-term capital loss of $17,025 and short-term capital gains of $2,844. Under § 122 (d) (4) as it stood in 1941 (see text, *supra*), long-term capital losses could not be deducted from short-term capital gains in computing net operating losses, while under the 1942 amendment the distinction between long and short-term capital losses was withdrawn. Taxpayer therefore had no net operating loss in 1941, but under the 1942 statute he would have had such a loss to the extent of his short-term capital gain of $2,844. The Court of Appeals for the Fifth

Since petitioner realized no long-term capital gains in 1941, its long-term capital loss on the Reo Sales stock could not enter into the computation of net operating loss.

In the Revenue Act of 1942, § 23 (g) of the Code, which defines capital losses, was amended by adding subsection (4).[5] This amendment had the practical effect of making losses such as that suffered by petitioner in the dissolution of Reo Sales Corp. ordinary rather than capital losses. Under 1942 law, therefore, the exception set out in § 122 (d) (4) is inapplicable, and a loss of this kind may enter into the computation of net operating loss.

It is petitioner's contention, reflected in its 1942 income tax returns, that although its loss in the liquidation of Reo Sales Corp. was incurred in 1941, determination of the amount of net operating loss was postponed until 1942, when it sought to carry over and deduct such net operating loss, and that the 1942 statutes therefore govern that determination. Since, under the 1942 statutes, its loss on Reo Sales stock was an ordinary loss, it claims the right to include that loss in the computation of net operating loss for carry-over and deduction from gross income in 1942. While § 101 of the Revenue Act of 1942 provides that "Except as otherwise expressly provided, the amendments made by this title shall be applicable only with respect to taxable years beginning after December 31, 1941," petitioner contends that this simply means

Circuit approved such an offset in the computation of net operating loss to be carried over to 1942 and deducted in that year. That decision is obviously inconsistent with the view we take of the statute and must be disapproved.

[5] Subsection (4), which was added by § 123 (a) (1) of the Revenue Act of 1942, provides that, for the purpose of determining capital losses, stock in a corporation affiliated with the taxpayer shall not be deemed a capital asset. "Affiliation" is defined in terms that clearly comprehend petitioner's ownership of Reo Sales Corp.

that such amendments shall be applicable only *in computing tax liability* for tax years after December 31, 1941.

The issue is, therefore, whether, in the computation of net operating loss, the governing statutes are those in effect during the year when the transaction occurred (1941), or whether the statutes in effect during the year when the net operating loss deduction is taken (1942) are controlling. The Commissioner's disallowance of petitioner's net operating loss deduction in 1942 was upheld by the Tax Court, 9 T. C. 314, and the Court of Appeals affirmed, 170 F. 2d 1001.

We think that a net operating loss must be computed on the basis of the tax laws applicable to the year in which the loss was suffered. What petitioner seeks here is not the kind of relief which the statute was designed to grant.[6] It asks that the carry-over section be used as a vehicle by which it may take advantage of changes in the tax laws in years after the taxable event has occurred. We find nothing in the language or legislative history of the statutes to justify such an interpretation.

The scheme of the statute is this: Section 23 (s) of the Code permits as a deduction from gross income "the net operating loss deduction computed under section 122." The amount of that deduction is determined in three separate steps. First, the net operating loss is determined. Section 122 (a)[7] provides the definition and method of computation of net operating loss, specifically providing that the exceptions and limitations of § 122 (d) are applicable in its computation. Second, net operating loss having been determined, the amount and extent to

---

[6] See H. R. Rep. No. 855, 76th Cong., 1st Sess. (1939); S. Rep. No. 1631, 77th Cong., 2d Sess. (1942).

[7] "(a) *Definition of net operating loss.*—As usual in this section, the term 'net operating loss' means the excess of the deductions allowed by this chapter over the gross income, with the exceptions and limitations provided in subsection (d)." See note 3, *supra*.

which it may be utilized as a carry-over is set out in § 122 (b) (2),[8] and as a carry-back in § 122 (b) (1). Finally, the amount which may actually be deducted from gross income under § 23 (s) is computed under the terms of § 122 (c).[9] That section provides for the aggregation of permissible carry-overs and carry-backs and the application of certain adjustments thereto.

The starting point is thus the determination of net operating loss under § 122 (a). We may point briefly to several circumstances which, we think, require a holding that net operating loss must be computed solely with reference to the statutes in effect during the year when the loss occurred.

First, under petitioner's theory, the net operating loss sustained in any given year would not be a fixed amount but would vary from year to year depending upon changes in the tax laws. But § 122 (a) defines net operating loss as "the excess of the deductions allowed by this chapter over the gross income." Clearly, determination of the amount of gross income and of allowable deductions for any given year must depend upon the tax statutes in

---

[8] "(2) *Net operating loss carry-over.*—If for any taxable year the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the two succeeding taxable years, except that the carry-over in the case of the second succeeding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the intervening taxable year . . ." computed in such a way that the carry-over must be used to offset certain nontaxable, as well as taxable, income. Section 122 (b) (1) is similar in language and theory.

[9] "(c) *Amount of net operating loss deduction.*—The amount of the net operating loss deduction shall be the aggregate of the net operating loss carry-overs and of the net operating loss carry-backs to the taxable year reduced by the amount, if any, by which the net income (computed with the exceptions and limitations provided in subsection (d) (1), (2), (3), and (4)) exceeds, . . . in the case of a corporation, the normal-tax net income (computed without such deduction and without the credit provided in section 26 (e)); . . . ."

effect during that year. If, as petitioner contends, 1942 law governs although the loss occurred in 1941, it is difficult to see why the whole of its 1941 operations, and not merely the Reo Sales liquidation, should not be recomputed on the basis of the income and deduction provisions applicable in 1942. Petitioner does not suggest such a recomputation, in spite of the fact that the terms in which net operating loss is defined—"gross income" and "deductions allowed by this chapter"—are equally applicable in the computation of income taxes generally. And even if a distinction could be drawn, so far as applicable law is concerned, between computation of net operating loss and computation of ordinary tax liability, we should think it strained and anomalous to read § 122 (a) as defining net operating loss in this case as "the excess of the deductions allowed for 1942 incomes over the gross income earned in 1941 but computed according to 1942 law."

Furthermore, the language of § 122 (b) negatives the contention that net operating loss for any given year is not a fixed amount but varies depending upon the law in effect during the year when the deduction is taken. Section 122 (b) (2), for example, states that "if for any taxable year the taxpayer has a net operating loss, *such* net operating loss" [10] shall be a carry-over for the two succeeding years. Under petitioner's interpretation, "such net operating loss" "for any taxable year" may be different amounts at different times. And, as in this case, what was no net operating loss at all for the year when the event occurred becomes a loss for that year through subsequent changes in the statutes. Similarly, in some cases in which the taxpayer had net income for the year under controlling law, subsequent changes in the law might produce a net operating loss for that year if

---

[10] Italics added.

petitioner's construction of the statute prevailed. We find no warrant for the view that Congress intended that a statute designed to equalize tax burdens should be used to produce net losses where none had previously existed.[11]

We also agree with the court below that the words of § 101 of the Revenue Act of 1942, which states that the amendments enacted therein "shall be applicable only with respect to taxable years beginning after December 31, 1941," cannot be read to mean "shall be applicable only in computing tax liability for taxable years beginning after December 31, 1941." To apply § 23 (g) (4) to establish a net operating loss is clearly to apply the 1942 amendment "with respect to" 1941, contrary to the statute.

Petitioner finds comfort in the fact that the 1924, 1926, 1928, and 1932 Revenue Acts, which permitted the carry-over of net loss from an earlier year, expressly provided that such net loss should be computed under the law in effect during the earlier period, while the present Code contains no such provision. Two observations may be made: first, that in reviving carry-overs in 1939 after a seven year lapse, Congress patterned the new statute generally on the prior practice without any suggestion of change in this particular; and second, that while such express provisions were appropriate in Revenue Acts prior to the Code, when the law of a prior year was of no effect when superseded by a new Act unless specifically made applicable, the present Code has continuous application, and incorporation of previous statutes is unnecessary.

[11] In commenting upon a similar possibility in connection with the net loss provisions of the Revenue Act of 1924, the House Committee on Ways and Means stated: "If capital losses were allowed as a deduction in computing the net loss, it would result in the anomalous situation of a taxpayer paying a tax in one year but at the same time having a net loss which he could carry over as a deduction in computing the tax for the subsequent year." H. R. Rep. No. 179, 68th Cong., 1st Sess. 19 (1924).

Instead, the old provisions remain in effect for prior years, and general provisions, such as § 101 of the 1942 Act, give amendments prospective application only, unless otherwise specifically provided.

The result is that net operating loss must be computed solely on the basis of the statutes in effect during the taxable year when the loss was incurred. Only if such a loss exists under those statutes will a taxpayer have anything that may be carried over or back. § 122 (a) and (d). The amount of net operating loss which may be utilized as a carry-over or carry-back and the extent to which it may be used as an offset to net income in another year depend upon the law of the year in which the "carry" is effective, § 122 (b), while the net operating loss deduction which may be taken in any one year depends upon the law in effect during that year. §§ 23 (s) and 122 (c).

With respect to petitioner's other contentions,[12] it is sufficient to say that they ignore the trichotomy plainly established with respect to § 122: determination of net operating loss; determination of the amount and extent of carry-over and carry-back; and determination of net operating loss deduction. The decision of the Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

---

[12] Petitioner relies, *inter alia,* upon some language in the Report of the Senate Finance Committee on the Revenue Act of 1942, S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 122, 123. But that portion of the Report is not concerned with computation of net operating loss but with establishment of carry-back provisions and amendment of the carry-over section. Its references are to the law applicable in determining the amount and extent of the carry-over and carry-back (§ 122 (b)), not to that applicable in determining net operating loss (§ 122 (a) and (d)).