**NORDEN–KETAY CORPORATION (formerly Ketay Instrument Corporation), Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 330, Docket 28077.

United States Court of Appeals
Second Circuit.

Argued May 29, 1963.

Decided June 28, 1963.

---

5. 340 U.S. at 154, 71 S.Ct. at 131.

6. 340 U.S. at 155, 71 S.Ct. at 131.

Don V. Harris, Jr., Washington, D. C. (Ernest S. Christian, Jr. and Covington & Burling, Washington, D. C., on the brief), for petitioner.

I. Henry Kutz, Attorney, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Thomas A. Skornia, Attorneys, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

Prior to 1951, petitioner was an established Illinois corporation primarily engaged in the business of mining coal under the name Consolidated Coal Corporation. During 1950, overtures to Lehman Bros., a New York investment banking

firm, had been made on behalf of the owners of the principal block of stock, with a view towards sale of the stock. Lehman Bros. located a buyer, the Ziegler Coal & Coke Company, which, however, as matters finally developed was interested only in purchasing the assets of Consolidated. The following transactions then took place: Lehman Bros. exercised the purchase options it had secured through an agent and became the owner of nearly 95% of the outstanding stock on February 28, 1951; on the same day Consolidated conveyed all its assets except cash and Treasury obligations to Ziegler in return for $3,900,000 cash and Ziegler's promise to pay 50% of all amounts received over $800,000 for certain "disposable properties" conveyed by Consolidated which were to be sold. Immediately on receipt of the cash payment, the directors of Consolidated declared a partial liquidating dividend nearly equivalent to the amount of the payment. This, of course, went mainly to Lehman Bros. At the same time, Consolidated filed a statement of intent to dissolve with the Illinois Secretary of State. Consolidated had sustained a loss on the sale of the assets of $3,509,043.55 and a net operating loss of $3,466,387.52 for 1951.

Consolidated remained dormant throughout 1951 and early 1952, declaring a further dividend in partial liquidation during this period. In March of 1952, Ziegler liquidated Consolidated's interest in the disposable properties for $250,000 cash, the agreement also requiring that Consolidated immediately take steps toward dissolution. Instead, the Consolidated directors began to search for some new field of endeavor which the corporation might enter. This quest culminated on April 6, 1953 in the purchase of the stock of three closely-held corporations, Ketay Manufacturing Corporation, Kinetix Instrument Company, and Ketay Research & Development Company (hereafter called the Ketay Companies), engaged in the manufacture and sale of precision electronic equipment. The total consideration was $2,275,000, later increased by $25,000, of which $100,000 was payable as a cash down payment and the balance in instalments over the next five years. The restrictive agreement with Ziegler was cancelled by mutual consent at about this time. Consolidated changed its name to Ketay Manufacturing Corporation, dissolved the three Ketay Companies, and took over their assets and management. The stockholders of the three companies were allowed to purchase newly issued Consolidated-Ketay stock, which they all did, and all of them remained as officers or directors of Consolidated-Ketay.

The corporation reported taxable income for 1954 from its electronics business of $1,007,623.38 before net operating loss deduction. It carried over a net operating loss from 1951 of $2,304,125.58 which had resulted principally from the sale of the coal-mining assets. After deducting this loss, the corporation reported a net loss for 1954 of $1,296,502.20. The Commissioner of Internal Revenue, by his notice of deficiency, disallowed the claimed net operating loss deduction. Petitioner seeks review of the decision of the Tax Court sustaining the asserted deficiency.

The applicable law is to be found in the Internal Revenue Code of 1939. See I. R. C. of 1954 § 172(g)(1). The particular provision that governs is I. R. C. of 1939 § 122, and the leading interpretation of the provision is to be found in the opinion of the Supreme Court in Libson Shops v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957). Application of the principles of that decision to the facts of the present case lead us to conclude that the decision of the Tax Court must be affirmed.

The precise question in Libson Shops was whether "a corporation resulting from a merger of 17 separate incorporated businesses, which had filed separate income tax returns, may carry over and deduct the pre-merger net operating losses of three of its constituent corporations from the post-merger income attributable to the other businesses." 353 U.S. at 382, 77 S.Ct. at 991.

Sixteen sales corporations had been merged into a management company without change in the actual business carried on by any of them. As the Supreme Court interpreted the statute, the legal problem upon which the case turned was the interpretation of the operative words "the taxpayer" in I. R. C. of 1939 § 122(b) (2) (C).[1] The purposes of the loss carry-over section, as revealed by the legislative history, yielded the solution:

> "The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business." (Citations omitted.) 353 U. S. at 386–387, 77 S.Ct. at 993.

The Court concluded that the carry-over was properly disallowed "since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." 353 U.S. at 390, 77 S.Ct. at 994. To properly apply section 122 as it was interpreted in Libson Shops we must therefore ask whether there has been "continuity of business enterprise," in effect, whether the same "business" that suffered a loss also reaped the gain against which it is to be offset.

■■ The first and most obvious factor in this determination is the nature of the corporate activity which produced the losses and gains. Here, the losses resulted from the sale of coal-mining assets, or, more generally, from a lack of success in the business of mining coal. The gains were produced by manufacture and sale of electronic equipment. In between, the corporation was stripped of all operating assets for a considerable period of time. Were we to hold for the taxpayer, it would permit a continuously profitable electronics enterprise to avoid large payments of taxes merely because of the fortuitous joinder of its set of assets to the shell of a coal-mining corporation which had a loss history. This does not fit the concept of a single enterprise averaging income over good and bad years to soften the impact of annual taxation which in Libson Shops the Supreme Court found to be the primary justification of the loss carry-over provision. But that decision did reserve the question whether a change in the character of the business of a single corporate entity might be enough, alone, to defeat the loss carry-over. 353 U.S. at 390 n. 9, 77 S.Ct. at 994. We may also reserve this question for we do not rely on this factor alone.

This discussion leads to the second major factor in determining the existence of continuity of business enterprise—continuity of stock ownership. Where there is continuity of ownership, there might well be justice in allowing a loss carry-over even though there has been a complete change in the nature of corporate activity. The purposes of the statute are ultimately directed toward granting a legitimate tax advantage to the shareholders behind the corporate entity. See Newmarket Manufacturing Co. v. United States, 233 F.2d 493 (1 Cir.,

---

1. "* * * If for any taxable year beginning after December 31, 1947, and before January 1, 1950, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the three succeeding taxable years, * * *".

1956), cert. denied 353 U.S. 983, 77 S.Ct. 1279, 1 L.Ed.2d 1142 (1957). It may well be that shareholders who sustain a loss and then are wise enough to liquidate an uneconomic enterprise and embark on a different and profitable field of endeavor through the same corporation are equally entitled to offset the earlier losses as those who see an unprofitable corporation through the lean years into the good ones in the same activity. But there was no such continuity of ownership in the present case. The losses were sustained by the group of shareholders who sold their stock to Lehman Bros. at the same time that Lehman Bros. was engaged in selling the corporate assets at a price carefully calculated to yield a profit. It could hardly be contended that the investment bankers bore the ultimate incidence of the three million dollar loss on the sale of the assets that fell in the first instance on Consolidated; in fact, it is agreed that they made a profit of approximately $200,000 on the sale to Ziegler. Further, it is clear that the benefit of the 1954 profits accrued to an almost entirely different group of persons from those who suffered the loss. Former Consolidated shareholders retained at most a 3% ownership of Consolidated-Ketay at that time. Whatever percentage might be necessary to constitute substantial continuity of ownership, it is more than that.

■ As there was neither continuity of ownership nor continuity of enterprise between the period of loss and the period of gain, we find the "continuity of business enterprise" required by Libson Shops to be lacking. No intelligible legislative purpose would be served by permitting a substantially new group of shareholders engaged in a different enterprise to benefit from the losses sustained by earlier owners in another business. In such a case, the corporate entity is the only link between them. The basic teaching of Libson Shops is that this is not enough. Decisions of the other Courts of Appeals in similar fact situations are in accord with this conclusion. See J. G. Dudley Co. v. Commissioner, 298 F.2d 750 (4 Cir.,

1962); Commissioner v. Virginia Metal Products, Inc., 290 F.2d 675 (3 Cir.), cert. denied 368 U.S. 889, 82 S.Ct. 140, 7 L.Ed.2d 88 (1961); Willingham v. United States, 289 F.2d 283 (5 Cir.), cert. denied 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 31 (1961); Bookwalter v. Hutchens Metal Products, Inc., 281 F.2d 174 (8 Cir., 1960); Mill Ridge Coal Co. v. Patterson, 264 F.2d 713 (5 Cir.), cert. denied 361 U.S. 816, 80 S.Ct. 57, 4 L. Ed.2d 63 (1959).

Petitioner seeks to distinguish these cases in several ways. First, it is argued that they involve "shell" corporations, unlike the present case. But this is to ignore the fact that Consolidated was for all practical purposes a "shell" for a long period of time, at least from the sale of all its operating assets in February, 1951 until the receipt of $250,-000 cash from Ziegler Coal & Coke Co. in March, 1952. During this period, it had no significant assets except the unliquidated contract claim on Ziegler and engaged in no business activity. The only actions taken, declaration of liquidating dividends and filing of a statement of intent to liquidate, indicated instead that Consolidated was in the process of complete liquidation. A corporation with no tangible assets engaging in no business activity might fairly be called a "shell".

■ Next, petitioner states that the only reason for the acquisition of a new enterprise in the above-cited cases was to take advantage of a potential loss carry-over, whereas here there is evidence that Lehman Bros. bought the stock without knowledge of the potential loss carry-over and with the sole objective of selling the stock at a profit. But this argument fails to recognize that findings under the loss carry-over provisions are independent of findings under I. R. C. of 1939 § 129, which would invalidate a transaction whose principal purpose was evasion or avoidance of taxes. In these cases, and in Libson Shops itself, the events were found not to permit a loss carry-over even though there was no Tax Court finding of an intent to evade or avoid taxes. Thus, whatever may be

petitioner's view of the transactions at issue, the courts tested them without tax evasion being established. As was said in Libson Shops, "[t]he fact that § 129 (a) is inapplicable does not mean that petitioner is automatically entitled to a carry-over." 353 U.S. at 389, 77 S.Ct. at 994. The situation is the same here.

Finally, petitioner argues that the case is distinct because assets were purchased by the corporation rather than contributed by shareholders or acquired through merger. It should be recalled in this connection that a three million dollar group of companies was "purchased" for a down payment of $100,000, without security, by a corporation having no other assets than $250,000 cash and the loss carry-over potential. The shareholders of the companies "purchased" were permitted to acquire a substantial interest in the purchaser and to continue to take part in management. This fact situation could well be considered to be a *de facto* merger—with Consolidated contributing its loss carry-over. But we need not reach this position, for we find no significance in this type of "purchase." The contrary result would destroy the effect of Libson Shops, for any corporation with a loss history would be able to negotiate a like purchase, financing the future payments through the tax savings gained by applying the loss carry-over against future income. In effect, though cash might be lacking, the loss carry-over would furnish the purchase price. There is, therefore, no significant distinction between this situation and the group of cases in which other Courts of Appeals have disallowed a loss carry-over.

■ ■ Petitioner's second argument for reversal of the Tax Court decision is wholly without substance. It is contended that the Commissioner is estopped to assert the deficiency by a prior favorable decision allowing the loss carry-over. But there was no such prior favorable determination by the Commissioner. A Revenue Agent (not the Commissioner), in the course of determining that the liquidating dividends paid by Consolidated would not be taxable as income to

the recipients in the event of its continued existence, stated that loss carry-over available for subsequent years to 1952 totaled $3,150,582.26. This report was made in 1952, before any of the assets which produced the new income had been acquired. Thus, the facts of the case could not have been before the Agent. The statement was merely a summary of some mathematical calculations made in a different context and represented no determination whatever that the operating loss would be available to different shareholders to offset the profits of another business. Even if such a determination had been made, it would have been a mistake of law which would work no estoppel. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957).

The decision of the Tax Court is affirmed.