**COMMERCIAL INDUSTRIES CORP.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

Civ. A. No. 565–64.

United States District Court
D. New Jersey.

April 14, 1967.

Gutkin & Miller, by Sydney A. Gutkin, Newark, N. J., for plaintiff.

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, by John G. Milano, Atty., Dept. of Justice, for the United States.

### OPINION

COOLAHAN, District Judge:

This is a civil action for refund of income taxes and interest assessed against and paid by the plaintiff, Commercial Industries Corp., [Commercial], for the calendar years of 1956, 1957 and 1958, in the amounts set out in the margin.[1]  Jurisdiction is premised on 28

| 1. YEAR | TAX | INTEREST | TOTAL |
|---|---|---|---|
| 1956 | $28,760.84 | $10,429.09 | $39,180.93 |
| 1957 | 86,509.58 | 26,151.96 | 112,661.54 |
| 1958 | 55,917.53 | 13,548.89 | 69,466.42 |
| | $171,187.95 | $50,120.94 | $221,308.89 |

U.S.C. §§ 1340, 1346.

The ultimate issue presented is whether the Commissioner of Internal Revenue properly disallowed the net operating loss carry-overs claimed as deductions by the plaintiff in its returns for those years, where such attempted carry-overs represent the net operating losses of a predecessor company, Seyer Silk Dyeing & Finishing Company, during the years 1951 through 1954.

The Government brings this motion for summary judgment.  For the reasons given below the motion will be denied.

Since the chronology of events has been stressed by both sides in regard the applicable Tax Code provisions, a brief history of the matter will be useful.  For purposes of this motion the Government is willing to assume the following facts.

Seyer Silk Dyeing & Finishing Co. [Seyer] was organized in 1931, and was engaged in the business of dyeing and finishing fabrics at its plant in Haledon, New Jersey.

On October 6, 1953, all the stock of Seyer was sold by the Seyer family to four individuals—Oliver Lazare, Bruno

Herman, Samuel Fire, and Arthur Rhodes—for $320,513.65. The last three named individuals were at that time associated in the ownership and operation of Nina Dye Works Company, Inc. [Nina], which was engaged in the same business of dyeing and finishing fabrics at its plant in York, Pennsylvania. Oliver Lazare, a customer of Nina, was invited to join in the purchase of Seyer by the owners of Nina.

Shortly after the purchase of the Seyer stock, the new owners voted to discontinue their own dyeing and finishing, allegedly on the ground that the machinery and equipment of Seyer was in poor condition and not capable of profitable operation. The machinery was sold,[2] but contact with Seyer's customers was retained; their orders for fabric were then obtained; and the actual dyeing and finishing was farmed out to other companies on a commission basis.

On May 24, 1954, seven months after the Seyer Company had been purchased, the other three owners bought Lazare's share of the Seyer stock for $140,949.88, representing a $34,000.00 gain to Lazare over his share of the original purchase price.

Thereafter, Seyer continued to accept orders on a commission basis for dyeing and finishing by other companies, until September, 1955.

Seyer incurred net operating losses during the years 1951 through 1954 which are set out in the margin.[3] In 1955 the three remaining owners of Seyer decided to merge it with Nina, whose shares they owned in the same proportion as the shares of Seyer. Nina had continued to do its own dyeing and finishing up to the merger when its machinery and equipment were sold prior to the consummation. The mechanics of the merger were simply that Seyer acquired the assets and liabilities of Nina and changed its name, effective as of September 8, 1955, to Commercial Industries Corp. From that date on, the Government contends, the income of the new corporation was derived principally from rents, interests, dividends, and commissions. There was also a side transaction involving a third corporation which is not pertinent to this motion.[4]

The net operating losses listed above for Seyer were claimed by Commercial as deductions in the years 1955 through 1958 as noted.[5] These deductions were claimed under Section 172 of Internal Revenue Code of 1954.[6]

2. The machinery and equipment was sold for $127,606.40; the inventory for $13,500. In addition, Seyer allegedly had cash assets of $117,864.95 as of October 6, 1953 and when Lazare's quarter interest was purchased in May, 1954, the real estate owned by Seyer was valued at $25,000.00.

3.

| YEAR | NET OPERATING LOSS |
|------|--------------------|
| 1951 | $141,123.94 |
| 1952 | 156,480.40 |
| 1953 | 159,853.84 |
| 1954 | 5,854.06 |
| TOTAL | $463,312.24 |

4. Shortly after the merger of Nina and Seyer, the newly named Commercial Industries Corp., issued 1,128 shares of its stock to Max Kettner for $610,587.52 in cash and a ten percent interest in the Delta Management Corporation, which was valued at $47,652.75.

5.

| YEAR | TAX DEDUCTION CLAIMED |
|------|------------------------|
| 1955 | $42,883.70 |
| 1956 | 65,886.23 |
| 1957 | 177,786.54 |
| 1958 | 143,579.97 |
| TOTAL | $463,312.24 |

6. Section 172, the successor provision to § 122 of the 1939 Code, provides:

"Sec. 172. NET OPERATING LOSS DEDUCTION.

(a) *Deduction allowed.*—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to each year, plus (2) the net operating loss carrybacks to such year. For the purposes of this subtitle, the term 'net-operating loss deduction' means the deduction allowed by this subsection.

[Part (b) indicates the amount of carrybacks and carryovers permitted,

These deductions were disallowed by the Commissioner who assessed deficiencies for those years. The deficiencies were paid, timely claim for refund filed, and the present action commenced.

## II.

The Government argues that the attempted carryover is governed by the Internal Revenue Code [I.R.C.] of 1939 and the case law thereunder, which it claims prohibits the deductions. It maintains that such carryovers are precluded by Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), and later cases applying that decision. Discussed more fully below, the *Libson* line of cases teaches that net operating losses cannot be carried forward (or back) to other tax years under Section 122 of the 1939 Code (predecessor of § 172, I.R.C.1954, supra) if there is an intervening substantial discontinuity between the business enterprise sustaining the losses and the enterprise which claims the deduction.

Plaintiff's reply is twofold. It feels that the availability of the carryover is governed not by the 1939 Code, but by the 1954 Code, under which it alleges that the carryover deductions were permissible. Alternatively, should the 1939 Code be deemed controlling, the plaintiff argues that the reasoning in *Libson* and its progeny are inapposite.

I find that plaintiff is incorrect as to the applicable Code, but I concur with its alternative argument that even under the 1939 Code the Government is not entitled to summary judgment.

Analysis of both issues has been somewhat obscured by several diversionary disputes. First, while it would seem obvious, it is necessary to emphasize that this is the defendant's motion; as movant, the Government is free to rely upon, or eschew, whichever grounds and theories it chooses. There were three points in the life of the Seyer Corporation which the Government claims resulted in substantial discontinuity of the business enterprise: (1) the 1953 100% change of stock ownership; (2) Seyer's shift to farming out dyeing and finishing on a commission basis; and (3) the 1955 statutory merger of Nina into Seyer with a concomitant change of the latter's name to Commercial Industries. Nonetheless, the Government made it absolutely clear that for purposes of this motion it relies solely upon the complete change of beneficial ownership in 1953 as precluding the carryover.[7] Plaintiff's emphasis on the occurrence of the statutory merger in a 1954 Code year is understandable, since the many cases relied on by the Government involved mergers, acquisitions, or comparable reorganizations. Still, the defendant need not rely on the effect of the merger for purposes of this motion if it chooses not to. Hence my analysis of both the applicable Code and of the ultimate issue on the deduction is confined to the precise ground which is advanced, and, therefore, much of plaintiff's reference to the merger in regard to the

---

and the years to which the loss may be carried].

(c) Net operating loss defined—For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d)."

[Part (d) lists certain modifications; Parts (e) (f) & (g) provide transitional rules for years prior to 1954 and those after; and parts (h) (i) (j) and (k) provide special rules.]

7. The Government has indicated that should the matter reach trial, it may also rely on the switch to farming out cloth work on a commission basis, which it contends was a substantial change in the nature of the business enterprise (either by itself or in conjunction with the alleged increase in the proportion of Seyer's income derived from rents and fixed fees unrelated to fabric processing). However, it admits that this would raise factual issues not subject to summary judgment. With respect to the 1955 merger, it is not clear to what extent it would be used at trial. See note 7, infra.

applicability of the 1954 Code is not relevant.[8]

Second, plaintiff stresses the legitimate business purpose of the original stock purchase and urges that the Code provisions dealing with acquisition of corporate control made to avoid Federal income tax do not apply. § 129 (I.R.C. 1939); § 269 (I.R.C.1954). This too is an assault on open doorways, since the Commissioner did not rely on that provision in denying the deduction.[9]

### III.

Turning to the question of which Code governs, I repeat that the merger of Nina into Seyer is not relied on for this motion. Despite plaintiff's admirable persistence on this point, its claim that "the operative transaction is * * * the statutory merger which occurred on September 8, 1955", is simply incorrect.

Plaintiff's second point is merely a justification for "applying subsequently enacted laws to determine the tax consequences of a pre-enactment transaction. * * *" However, plaintiff focuses on only two dates for testing the availability of a carryover, namely, the loss year and the tax year. The cases demonstrate that a tripartite analysis is necessary. The three relevant dates are: (1) the loss year; (2) the year in which the deduction is claimed or tax year; and (3) the year in which a discontinuity allegedly occurred in the corporate chain between the loss and the deduction. Of course under particular facts, the "discontinuity year" may be identical with either the "loss year" or the "tax year". But it is the "discontinuity year" which is critical, since it is the tax significance which the corporate combinations or transaction then had that determines whether the *Libson* gloss on Section 122 controls or whether the carryover is governed by the provisions of the 1954 Code which partially repeal *Libson*.[10]

Here not only the pertinent losses occurred in 1939 Code years,[11] but the event which purportedly cut off the carryover privilege occurred in 1953; its tax treatment and significance are determined under the 1939 Code. *Allied Central Stores, supra;* Fawick Corp. v. Commissioner, 342 F.2d 823 (6th Cir., 1955); Humacid Co., 42 T.C. 894 (1964); Norden-Ketay v. Commissioner, 319 F.2d 902 (2nd Cir., 1964) cert. denied, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313. Cf. Fredrick Steele Co. v. Commissioner, 375

---

8. The Government concedes that the Internal Revenue Code of 1954 governs the effect of the merger in 1955 and that *Libson Shops* does not apply since the Internal Revenue Service has stated that it will not urge application of *Libson Shops* to mergers occurring in 1954 Code years. Rev.Rul. 58–603, 1958–2 Cum. Bull. 147.

9. Either the stock purchase by itself cut off the carryover privilege or it did not; this depends on the scope of the benefit conferred by Congress as interpreted by the Courts. If the cases circumscribing the privilege apply to that transaction, then the subsequent deductions were improper whether or not avoiding income taxes was the motive for the purchase. *Libson Shops,* supra, 353 U.S. at 388–389, 77 S.Ct. 990. The question of "good faith" business purpose need only be reached if the loss carryover provisions are otherwise applicable. Federal Cement Tile Co. v. Commissioner, 338 F.2d 691, 694 (7th Cir. 1964); and see J. G.

Dudley v. Commissioner, 298 F.2d 750 (4th Cir., 1962) [treating the § 122 issue and the § 129 issue separately]; compare Mill Ridge Coal Co. v. Patterson, 264 F. 2d 713 (5th Cir., 1959).

10. "If Libson Shops was superseded by the 1954 Code the superseding sections are Sections 381 and 382. However, these sections are applicable only to mergers occurring after June 22, 1954. See Int.Rev.Code of 1954, §§ 393–394." Allied Central Stores, Inc. v. Commissioner, 339 F.2d 503, 504 (2nd Cir., 1964).

Thus, plaintiff's extensive discussion of disparate areas of tax law involving only two dates (such as deferred income earned in one year but received and recognized in a later year with an intervening change in the tax law) offers no useful analogies.

11. The sole exception is the $5,000.00 loss in 1954 which defendant concedes was not barred from being carried forward by the 1953 stock purchase.

F.2d 351 (6th Cir., 1967) 67 — 1 U.S. T.C. 9279.[12]

Plaintiff's third point is based on Subsection 172(e) of the 1954 Code. It cites American Bank and Trust Co. v. United States, 333 F.2d 416 (5th Cir., 1964) for the proposition that § 172(e) requires the availability of loss carryovers for deduction in 1954 Code tax years to be determined under Section 172 of that Code. The reliance on Subsection (e) and on the *American Bank* case is misplaced.[13] The pertinent subsection of § 172 in regard to the "availability" of pre-1954 Code year losses for deduction in 1954 Code years is § 172(g) (1) which indicates that their deductibility is governed by the 1939 Code. See Norden-Ketay, supra, 319 F.2d at 904.

The possible effect of the change in stock ownership in 1953, then, must be considered in the context of the restrictions placed on § 122 of the 1939 Code, by the *Libson Shops* line of decision to which I now turn.

### IV.

The Government's theory in regard to the 1953 stock purchase is appealingly simple. It posits an independent requirement of continuity in stock ownership, wholly apart from the context of a corporate merger or reorganization. Under this view, that requirement, though unmentioned in *Libson Shops* where no such problem existed, has somehow acquired a life of its own from the cases interpreting *Libson*. Extrapolating from those and earlier decisions, the

---

12. The *Fredrick Steele* case is not to the contrary. While it contains some general language that Sections 172, 381 and 382 of the 1954 Code are applicable because the "tax years" in which the deductions were claimed were 1954 Code years, the alleged discontinuity there was the acquisition of a separate business in 1954. Hence, only the "loss years" in *Fredrick Steele* were 1939 Code years. The court noted that its decision in *Fawick* was left unchanged.

13. Subsection 172(e) provides: "In determining the amount of any net operating loss carryback or carryover to any taxable year, *the necessary computations involving any other taxable year* shall be made under the law applicable to such other taxable years. The preceding sentence shall apply with respect to all taxable years, whether they begin before, on, or after January 1, 1954." [Emphasis added].

Plaintiff claims that the Government has confused a carryover loss's "computation," which 172(e) admittedly requires under the 1939 Code in this case, with its "availability". According to plaintiff, the *American Bank* case held that availability was determined under the 1954 Code if the deduction is sought in 1954 Code tax years. Quite the contrary, it is plaintiff who has confused the question of "adjustment" of computed loss carryovers prior to their deduction (the point at issue in *American Bank & Trust)* with the question of their "availability" under the *Libson* doctrine despite a business

discontinuity between the loss and the tax years.

Section 172(e) refers to the fact that under the 1939 Code the allowance of carryover and carryback loss deductions is tied to the notion of "economic loss", while the comparable concept in the 1954 Code is "taxable loss." The practical result is this. Under either Code, the computation of the loss to be carried forward or back is essentially the same and is governed by the provisions in effect during the "loss year." However, because of the "economic loss" concept, loss carrybacks sought to be deducted in 1939 Code years, must be further adjusted by subtracting from the aggregate of available carrybacks the amount of nontaxable income received in the tax year for which the deduction is claimed. When deductions are sought in 1954 Code years, on the other hand, the amount of deduction allowed is the aggregate of all available carryovers (and carrybacks) to that year without adjustment.

As the exhaustive opinion in *American Bank & Trust* shows, § 172(e) refers to this question of adjustment prior to deduction, an arithmetical calculation totally distinct from the loss of a carryover's availability as a legal matter under the *Libson* doctrine of business contonuity. 333 F.2d at 418–419.

Reo Motors v. Commissioner, 338 U.S. 442, 70 S.Ct. 283, 94 L.Ed. 245 (1950), also cited by plaintiff, for what it is worth here, stands for the same distinction as *American Bank* and is inapposite.

Government argues that continuity of beneficial ownership is the *sine qua non* for using the loss carryover and should be the focus of initial inquiry.[14] It concludes that a substantial change (or at least the 100 per cent change in Seyer's ownership) suffices, without more, to cut off the carryover.

According to the Government, since the provisions of § 122 were intended to benefit stockholders rather than the formal corporate entities, where the beneficial ownership changes, the rationale for the carryover privilege ceases. See Newmarket Mfg. Co. v. United States, 233 F.2d 493 (1st Cir., 1956).

True, *Libson Shops* notes that § 122 was designed to enable a business to average its lean and its lush years. Further, *Libson Shops* approvingly cites the *Newmarket* case, which earlier had observed that this intent looked ultimately to the "flesh and blood" shareholders behind the legal abstraction of the corporate taxpayer. Both these references, however, must be read against the tortuous history of Section 122's judicial treatment and the several factors which the courts had then, and have since, considered.

This history has been fully detailed elsewhere. See especially Wisconsin Central R. R. Co. v. United States, 296 F.2d 750, 155 Ct.Cl. 781 (1961) cert. denied 396 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286; Julius Garfinckel & Co. v. Commissioner, 335 F.2d 744 (2nd Cir., 1964) cert. denied, 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556. The earliest Supreme Court decision pegged the carryover privilege to the requirement that the taxpayer claiming the deduction be the same corporate legal entity as the taxpayer which actually had incurred the losses. New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); Helvering v. Metropolitan Edison Co., 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957 (1939).[15] Under this approach, carryovers were permitted even though the type of business and the stock ownership had changed, as long as the charter had not. E. g. Alprosa Watch Co., 11 T.C. 240 (1948).

Finally, a year before *Libson Shops*, the First Circuit permitted a carryback of losses incurred by a successor corporation to offset prior profits of its parent which had been statutorily merged into the subsidiary. Newmarket Mfg. Co. v. United States, supra. The court listed the continuity of stock ownership as one of the several factors which justified bypassing the "same taxpayer" hurdle, but also emphasized that even absent the merger the carryback would have been permissible.[16]

14. "In addition to the doctrine of Libson Shops of 'continuity of business enterprise', the courts have developed the requirement that there also must be a 'continuity of beneficial ownership' in stock of the loss corporation as well. * * * If the answer to the first inquiry is that the ownership has changed, then there is no need to determine whether the business being conducted has remained the same." Brief for the Defendant, pp. 9–10.

15. In *New Colonial*, a voluntary transfer of assets and liabilities to a new corporation was deemed fatal and the same result was reached in Donohue v. United States, 112 F.Supp. 660 (E.D.Mo.1953) (a Chapter X reorganization) on the grounds that in each instance the company seeking the deduction was not the same taxpayer as its loss corporation predecessor. In the case of statutory merger, however, the Court deemed the loss corporation to be "drowned in" and metaphysically still existing through its successor, thereby permitting the carryover. *Metropolitan Edison*, supra. and see Stanton Brewery v. Commissioner, 176 F.2d 573 (2nd Cir., 1949); Koppers Co., Inc. v. U. S., 134 F.Supp. 290, 133 Ct.Cl. 22 (1955).

This technical approach apparently discouraged a significant number of otherwise valid corporate reorganizations. See Rapp, Current Problems With Carryovers and Carrybacks Following Corporate Reorganizations, 6 N.Y.U. Ann.Tax Inst., 327, 335 (1948).

16. 233 F.2d at 497. The parent Massachusetts corporation created a Delaware subsidiary and merged itself into it. There was a complete transfer of assets and liabilities and a continuity of both ownership and business activity, all of

In *Libson,* the same shareholders owned 17 separate corporations; each of 16 carried on retail clothing businesses, while the 17th provided them with management services. The retail stores were merged into the management company, which thereafter conducted all the businesses as a single enterprise. Three of the retail shops had incurred net operating losses prior to the consolidation and continued to lose after it. The taxpayer's attempt to offset their pre-merger losses against the post-merger profits netted by the overall operation was rejected.

Following the First Circuit's lead, the Court side stepped the earlier test of identity between the taxpayer and the loss corporation. Emphasizing economic realities, it stressed that the profits had been earned by identifiable business units different from those which had suffered losses.[17] Moreover, the Court noted that without the consolidation there could have been no use of the carryover since the three losing units had no post-merger profits. It was in this context that the Court cited the *Newmarket, Koppers* and *Stanton Brewery* cases as meeting the "continuing enterprise" test.[18]

The varied situations presented in the decisions following *Libson Shops* have included many kinds of corporate changes: some involved discontinuity in the identity of the taxpayer; some a discontinuity in the line of endeavor; some a change of beneficial ownership; and some the juxtaposition of one business unit's losses against the profits of another. More often than not, they have involved a combination of more than one type of discontinuity.

Nevertheless, I have concluded that in each instance it was some basic change in the structure of the loss corporation as an identifiable business unit, either through formal reorganization or through interaction with other corporations, which precipitated the Commissioner's scrutiny. In those cases where the carryover or carryback ultimately was denied, the *Libson* test of business enterprise continuity was applied primarily because the profits and the losses were earned by sufficiently different business units, and it was only the merger or reorganization which created an opportunity for their set-off.

In the case of reorganization, *Libson Shops* was followed where the restructured corporation was a substantially different business unit from the one which had incurred losses. Huyler's v. Commissioner, 327 F.2d 767 (7th Cir., 1964);

which was noted by the Court. The court declined to rely solely on the *Metropolitan Edison* notion that the prior taxpayer somehow survived in the merged corporation. By stressing that *Newmarket* would have been able to offset the profits and losses even absent the change of domicile via merger, it was able to distinguish the *Libson* case, then on appeal from the Eighth Circuit. Ibid.

17. "The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. * * * They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business *which had been* operated and taxed separately before the merger.* What history there is suggests that Congress was primarily concerned with the fluctuating income of a single business." [Emphasis supplied] 353 U.S. at 386–387, 77 S.Ct. at 993.

18. In each of these cases, a carryover would have been valid apart from the corporate shuffle. In *Stanton,* supra, the surviving parent company was a holding corporation, so the post-merger profits were attributable to the same business unit (the operating subsidiary) as had incurred the pre-merger losses. In *Koppers,* supra, the parent and the subsidiary corporation had filed a consolidated return even prior to the merger in question. As for *Newmarket,* see note 16, supra. Thus, there was no reason to deny the offset privilege in these cases, when, but for the merger, it would have been available; while in *Libson,* the taxpayer would have obtained an advantage by virtue of the merger. See 353 U.S. 288, 77 S.Ct. 990, note 7.

Willingham v. United States, 289 F.2d 283 (5th Cir., 1961); Wisconsin Central R. R. Co. v. United States, 296 F.2d 750, 155 Ct.Cl. 781 (1961).[19] Libson Shops was distinguished in a reorganization which preserved the prior loss corporation as an identifiable business unit whose post-reorganization losses were carried back to offset its pre-reorganization profits. F. C. Donovan, Inc. v. United States, 261 F.2d 470 (1st Cir., 1958).[20]

In *Donovan*, there was no danger, warned of in *Libson*, that a windfall might arise solely because of the corporate reshuffle. The court noted that if the parent and subsidiary had not combined in a reorganization, but "had continued their operations in almost any other way than that which they chose, the claimed net operating loss carry-back would have been allowed." 261 F.2d at 474–475. The Government cites a passage in *Donovan* reconciling that decision with the court's earlier *Newmarket* opinion. But the Government's selective emphasis plainly ignores the thrust of the reference which hardly suggests that

19. *Huyler's* involved successive Chapter XI and Chapter X reorganizations of a food company which resulted in a new corporate structure, new ownership, and the acquisition of a metals business, which was the unit that generated the profits against which the deduction was sought. 327 F.2d at 772. *Willingham* was a criminal prosecution for tax evasion, but the defense was that the amount owed should have been reduced by a carryover of losses incurred by the predecessor corporation before an intervening Chapter X reorganization. Although the corporate form of the transportation company could be traced through the reorganization, the court found the business unit which had suffered the loss was, for all practical purposes, a different company than the reorganized profit corporation. The court noted not only the change in stock ownership but also the completely revised corporate structure, the reorientation of business activity, and the fact that the reconstructed capital was subject to depletion if operating profits did not yield the 5% of gross revenues which the new stockholder (Willingham) had guaranteed to pay under various agreements with the United States and prior creditors. The court concluded with the wry observation that "This loss taxpayer 'set off its lean years' by having them wiped out in reorganization proceedings." 289 F.2d at 287. *Wisconsin Central Railroad* includes some language, which, taken out of context, offers support for the Government's theory. The taxpayer, a successor corporation in a section 77 Railroad reorganization, sought a carryback of its losses to offset profits of the prior company. The attempt was denied on several grounds including the fact that the reorganization had not been a tax free one (within Section 112(g) (1) of the Int.Rev.Code of 1939); the fact that there was not a complete assumption of the predecessor's liabilities; and the fact that the ownership had changed and included several of the predecessor's former creditors. Discussing the change in ownership factor *last*, the court concluded its opinion as follows: "The same business was being carried on, but by a different group of people. Thus, continuing ownership is not present, and, hence, the successor corporation cannot carry back its losses to offset gain realized by the old corporation." 296 F.2d at 756. Read in the context of the entire opinion, this passage's reference to the "same business" refers to the line of endeavor, i.e. railroading; it does *not* hold that the change of beneficial ownership sufficed to cut off the carryover. Indeed, it is noteworthy that the *Wisconsin Central* court assumed throughout that they were applying the *Libson Shops* test, while the Government maintains that its test of continuity of ownerships is a separate requirement "in addition to the doctrine [in *Libson*] of 'continuity of business enterprise'. * * *" See n. 13, supra. Compare Donovan v. United States, infra.

20. The carryback was permitted in *Donovan* for two equally valid reasons. There, the parent corporation, which was in the leather business, absorbed a subsidiary in the plastics business by way of a tax free reorganization rather than a statutory merger. The Court of Appeals distinguished *Libson* both on the ground that the two companies had filed consolidated returns before the reorganization, and on the ground that the losses sought to be carried back were attributable to the subsidiary which operated as an identifiable division within the reorganized parent.

either *Newmarket* or *Donovan* turned on ownership alone.[21]

In the more complicated field of mergers between previously unrelated corporations, the post-*Libson* decisions have similarly wrestled with the concept of "continuity of business enterprise." But here again, the common thread is their emphasis on the heart of *Libson*, namely the prohibition of matching the losses of one identifiable business unit against the profits of another.

The Court of Appeals in this Circuit has held that when a new profit making business is merged into the surviving shell of a loss corporation, the latter may not carry over its pre-merger losses to post-merger profits attributable to the new business. Commissioner v. Virginia Metal Products, 290 F.2d 675 (3rd Cir., 1961). Stripped of intermediate complications, that matter involved merger of a losing window screen and furnace equipment business [Winfield Corp.] and the successful multi-company Virginia Metal Corporation. Virginia acquired Winfield's stock, sold its assets, and placed one of Virginia's profitable companies into Winfield's shell. The court followed *Libson*, adding in dictum that the case before it was even stronger for the Commissioner because of the added factors of discontinuity in the line of business and in the ownership. (Taking a view not accepted by all students of *Libson*, the court assumed that there a single line of endeavor, i. e. women's retail clothing, was involved).

Any assumption, however, that Virginia Metal Products was premised upon the discontinuity in ownership is belied by the fact that the two decisions primarily relied on were applications of *Libson* involving no change of ownership.[22]

The same result has been reached in other merger cases, both where a profit company was merged into the mere shell of a loss corporation, *J. G. Dudley Co.*, supra; *Federal Cement Tile*, supra; and where the loss corporation's original business was continued, but the post-merger profits were attributable to the engrafted business unit. *Fawick Corp.*, supra.[23] Like *Virginia Metal Products*,

---

21. "But we thought we had made it clear enough in the *Newmarket* case *what we took to be of paramount importance, that the ownership and all other practically important attributes of the business* which suffered the loss in 1952 and the business of the business which had earned income in the previous year were unchanged. This is also true in the present case." Donovan v. United States, supra, 261 F.2d at 472. (Italics by the Government, underlining by this Court).

22. Bookwalter v. Hutchens Metal Products, 281 F.2d 174 (8th Cir. 1960); and Patten Fine Papers, Inc. v. Commissioner, 249 F.2d 776 (7th Cir., 1957). Both cases turned on the rule that "a prior year's loss can be offset against the current year's income only to the extent that this income is derived from the operation of substantially the same business which produces the loss." *Patten Papers*, 249 F.2d at 780. The Third Circuit also cited Mill Ridge Coal v. Patterson, supra, where there was a shift in ownership, but noted that in *Mill Ridge* the Commis-

sioner had also established a principle purpose of tax avoidance under § 129 (I.R.C., 1939).

23. In *Dudley*, the shell of a family owned hosiery company was bought by friends who filled it with their successful plumbing business. A motive of tax avoidance under § 129 (I.R.C., 1939) was found, and, therefore, the Court followed both *Virginia Metal Products* and *Mill Ridge Coal*. The *Federal Cement* case was more complex. A loss corporation using a patented tile process was purchased by another tile manufacturer under an agreement which left the former owner all assets, employees, pending orders and liabilities, while the purchasers gained the right to use the patented process in a different part of the country. The purchaser's profitable company was merged into the acquired shell. Although both the pre-merger loss operation and the post-merger profit one were tile manufacture, the merged company's use of the patented process was an insignificant portion of its operation; the court followed *Libson* strictly and found the con-

these decisions teach only that the *Libson* test of continuity between the loss operation and the profit one applies even if the loss corporation survives the merger and, hence, is technically still the "same taxpayer."

The fullest treatment of the relationship between stock continuity and the carry-over privilege appears in a series of Second Circuit decisions: *Norden-Ketay*, supra; Julius Garfinckel & Co. v. Commissioner, 335 F.2d 744, (2nd Cir., 1964); *Allied Central Stores, Inc.*, supra. In *Norden-Ketay*, since the surviving taxpayer was the original loss corporation, the Court first considered the variance between the profit business and the loss business, and then considered the change in stock ownership as a second factor bearing on the "continuity of the business enterprise." [24] But the full passage discussing continuity of ownership shows that it was explored as a possible saving grace, which might preserve the carry-over otherwise precluded by the merger.[25] Thus, the Court of Appeals in *Norden-Ketay* prefigured the problem, spelled out in Garfinckel the following year, of whether continuity of ownership could be an ameliorating fact in situations where *Libson* was prima facie applicable.

This was made clear by Judge Friendly's thoughtful review of *Libson* and its aftermath in *Garfinckel*. Julius Garfinckel & Co. had acquired all the stock of Brooks Brothers (a profit corporation) by 1947, and about 58 per cent of DePinna (a loss corporation) in 1950; both companies retailed men's wear. In 1952 Garfinckel caused Brooks Brothers to be

---

tinuity of the enterprise minimal. *Fawick Corp.* involved more than a shell. Fawick Airflex, a profitable air brake manufacturer was merged into Federal Motor, an unprofitable truck maker. The truck manufacturer survived as the Federal Division of the Federal Fawick Company but continued to lose, and the court denied a carryover of its pre-merger losses to offset profits attributable to the Airflex division.

24. An investment brokerage firm acquired the stock of a sinking coal company, sold its assets to another coal company, and merged three profitable electronics concerns into the remaining shell. The Court of Appeals denied the electronics companies the right to prune their taxable income merely because they had married a corporation with a loss history. "This does not fit the concept of a single enterprise averaging income over good and bad years to soften the impact of annual taxation which, in *Libson Shops* the Supreme Court found to be the primary justification for the loss carry-over provisions." 319 F.2d at 905.

25. "Where there is a continuity of ownership, there might well be justice in allowing a loss carry-over *even though there has been a complete change in the nature of the corporate activity*. The purposes of the statute are ultimately directed toward granting a legitimate tax advantage to the shareholders behind the corporate entity [Citing *Newmarket*]. It may well be that shareholders who sustain a loss and then are wise enough to liquidate an uneconomic enterprise and embark on a different and profitable field of endeavor through the same corporation are equally entitled to offset earlier losses as those who see an unprofitable corporation through the lean years into the good ones in the same activity." 319 F.2d at 905, 906. [Emphasis added]. This excerpt, moreover, must be read in light of the court's concluding summary. "As there was *neither* continuity of ownership *nor continuity of enterprise between the period of loss and the period of gain*, we find the "continuity of business enterprise" required by Libson Shops to be lacking. No intelligible legislative purpose would be served by permitting a substantially new group of shareholders *engaged in a different enterprise* to benefit from the losses sustained by earlier owners *in another business*. In such a case the corporate entity is the *only link* between them. The basic teaching of *Libson Shops* is that this is not enough." Ibid. [Emphasis added.]

merged into DePinna, the latter remaining as the surviving corporate entity, *but* changing its name to Brooks Brothers, Inc. Garfinckel thereby acquired approximately 95 per cent of the consolidated company.

Unlike the situation in *Norden-Ketay*, the loss corporation had not been a mere shell at the time of merger, both companies had been in the same business, and there was substantial overlap of stock ownership; unlike *Libson*, the loss corporation was the surviving entity. Thus, Judge Friendly found himself faced with a question left undecided by those two cases:

"When a corporation which has incurred losses but is still actively engaged in business acquires by consolidation another corporation with a history of profits in the same business, does § 122 permit the consolidated corporation to deduct pre-consolidation losses from post-consolidation profits derived solely from operations of the acquired corporation—this in a context in which a single stockholder owned 58% of the common stock of the loss corporation and 100% of the common stock of the profit corporation during the period of the losses and, by virtue of the consolidation, owned 95% of the stock of the surviving corporation? With some hesitation, we have concluded that Libson requires a negative answer." 335 F.2d at 745.

Judge Friendly then reviewed the difficult questions raised by *Libson* when the loss corporation was the survivor and found it "hard to draw an intelligible line between a case where a corporation has provided itself with new assets to establish a new business and another where it has bought a business already established." [26] He hypothesized a continuum of situations varying as to the pre-merger relationship of the corporations; the method of combination or acquisition; and the degree to which the original loss corporation, whether acquired or acquiring, was merely a shell.[27] The important point is the plain assumption that as a common denominator each situation involved a combination or reshuffle of several businesses.

In short, the Court seemed to contemplate the possibility that the pre-*Libson* results in *Newmarket* and *Metropolitan Edison* might be appropriate if the taxpayer could show sufficient ameliorating facts such as continuity of beneficial ownership and proof that the loss company was more than a shell. If anything is clear, it is that the carryover was *not* denied, as the Government contends "solely" because of the change in stock ownership.[28]

---

26. Compare *Norden-Ketay*, cited at note 24, supra. Judge Friendly also adverted to the infamous footnote in *Libson Shops*, 353 U.S. at 390, n. 9, 77 S.Ct. 990, 1 L.Ed.2d 924, wherein the Supreme Court declined to pass on the effect of *Libson* on prior decisions permitting the carryover although there had been a complete change of business, and, in two instances, a change of ownership as well—within a single corporation. See *Garfinckel*, supra, 335 F.2d at 746.

27. The concrete starting point of this continuum was found in Rev.Rul. 63–40 1963–1 Cum.Bull. 46 which announced that the Service would not rely on the rationale of *Libson Shops* if a loss corporation, without significant change of ownership, acquired another business by purchasing its assets for cash at fair market value.

28. "We can make only the unilluminating statement that in a transaction in which a 58% owner of a loss corporation causes it to acquire a wholly owned profit corporation, with a subsequent increase in its ownership of the survivor to 95%, the discontinuity between the before and the after seems sufficient to cause the case to be attracted by *Libson Shops*. If we have misunderstood that opinion, we would be even more than usually willing to be corrected, since there is much appeal in Garfinckel's 58% ownership of DePinna during the years of the losses, although the Commissioner counters that in *Libson Shops* there was complete identity in stock ownership before and after merger." 335 F.2d at 749.

Shortly after the decision in the *Garfinckel* case, the Second Circuit denied the loss carry-over to profits arising after a consolidating merger of several department stores, since the revenues had been generated by different units than those suffering the pre-merger losses. *Allied Central Stores, Inc.* supra. Even though all three stores had been *wholly owned by a common parent* corporation prior to their merger, the court held that "[T]he regrouping of subsidiaries which have been treated as separate entities, with resultant changes in stated capital, total assets, and net worth, has an effect on 'continuity'". 339 F.2d at 504.

Reviewing all the above discussed decisions, I conclude that the correct legal analysis is the exact reverse of the Government's position. That is, the minimum requirement for denying the privilege is that there be some substantial change between the business unit involved in the loss years and that unit which creates the profits; even then, if there is anything left of Judge Friendly's dictum in *Garfinckel* after the Supreme Court's denial of *certiorari* and the subsequent decision in Allied, the privilege may not be forfeit in appropriate cases of continuity in stock ownership.

None of the post-*Libson* decisions, either singly or collectively, stand for the proposition that change in ownership alone suffices. To hold that such a discontinuity within a single company, otherwise unchanged, eliminates § 122 would be not only to extend the already much-criticized *Libson Shops* doctrine, but also to open a Pandora's box of difficulties in determining when sufficiently substantial and permanent stock transfers had occurred.[29] I shall decline the opportunity. Defendant's motion is denied.

Let an appropriate order be submitted.

29. In addition to partial changes in the ownership of a large widely held public corporation, there would be the problem of determining the effect of corporate ownership sold during a loss period and then reacquired by the original owner either before or after the company's fortunes brightened.